UNITED STATES of America,
Plaintiff,

v.

JEFFERSON PARISH SCHOOL BOARD
et al., Defendants.

Civ. A. No. 71–2679.

United States District Court,
E. D. Louisiana,
New Orleans Division.

Oct. 19, 1971.

Gerald Gallinghouse, U. S. Atty., and James Carriere, Asst. U. S. Atty., Chief, Civil Division, New Orleans, La., for the United States of America.

Wallace C. LeBrun and David M. Smill, Metairie, La., for Jefferson Parish School Board.

Samuel I. Rosenberg, New Orleans, La., for Orleans Parish School Board.

Shea & Gardner, by Stephen J. Pollak, Washington, D. C., for National Education Ass'n of United States, Louisiana Education Ass'n, Jefferson Education Ass'n, Julius Hunter, Aletha Clark, and Scott R. Smith.

Nelson & Nelson, by John P. Nelson, Jr., New Orleans, La., for Orleans Educators' Ass'n, Cheryl Ann Epling, Carrel Epling Martin, Warren J. White and Delores Wilmore.

Bell, Williams & Eames, by Murphy W. Bell, Baton Rouge, La., for Julius Hunter, President of Jefferson Education Ass'n, a Parochial Unit of Louisiana Education Ass'n.

William F. Wessel, New Orleans, La., and Ligtenberg, DeJong & Leahy, by John Ligtenberg, Chicago, Ill., for American Federation of Teachers, AFL–CIO; American Federation of Teachers of Orleans Parish, Local 527; Jefferson Parish Federation of Teachers, Local 1559; Alma Granderson, David Lee Coleman, Marilyn Pierre, Christine La-Grange, and Edward A. Fontaine.

Sanders, Miller, Downing & Kean, by John Dale Powers, Baton Rouge, La., for Essie C. Beck, Joseph Thomas and Lola S. Bundrick, Individually, on their own behalf, and for and on behalf of all persons similarly situated.

Burton, Roberts & Ward, by John Ward, Jr., Baton Rouge, La., for Louisiana School Boards Ass'n.

## REASONS IN SUPPORT OF JUDGMENT

R. BLAKE WEST, District Judge.

In this suit plaintiff United States of America sought to enjoin the implementation by the school boards of Orleans and Jefferson Parishes of recently enacted increases in teachers' salaries within their respective jurisdictions. The action was brought pursuant to the Economic Stabilization Act of 1970 [1] and Executive Order 11615.[2] It was alleged by the Government that the salary increases authorized by the respective school boards were violative of the aforementioned Executive Order which seeks to "stabilize" wages and prices at those levels existing prior to August 15, 1971. The Government, in its pleadings, sought not only to restrain implementation of any increase in teachers' salaries but also requested a reduction in wages for those salaries paid some teachers at the higher wage prior to August 15, 1971 and deduction from the next forthcoming pay checks of the alleged over-payment made to teachers at the higher rate.[3] The Government's position was vigorously contested by the school boards and numerous intervenors and amici curae. In the light of the terms of the Government's legislative and executive pronouncements in the critical area of wage and price controls, and in view of the structure and operation of the parish school system in Louisiana, this Court holds that the wage increases in dispute are beyond the scope of the wage-price guidelines established by the Executive Order.

The principal statutory authority for wage stabilization is the Economic Stabilization Act of 1970, which granted the President broad authority for dealing with the Nation's economy and, particularly, with the increasing spiral of inflation. Specifically, the President was given the power to stabilize prices, rents, wages and salaries at fixed levels.[4] The Act authorized the President to delegate

---

1. Public Law 91–379, 84 Stat. 799, August 15, 1970 as amended by Public Laws 92–8, 85 Stat. 13, March 31, 1971 and 92–15, 85 Stat. 38, May 18, 1971.

2. 36 Fed.Reg. 15727.

3. At the trial, the Government took the position that any teachers who worked and were actually paid at the increased rate during the "critical period" should continue to be paid at the higher rate.

4. Sec. 202(a) of the Act provides that "The President is authorized to issue such orders and regulations as he may deem appropriate to stablize prices, rents, wages, and salaries at levels not less than those prevailing on May 25, 1970. Such orders

to other officers or agencies the actual performance of duties involved in the administration of the Act.[5] Enforcement provisions, including injunctive relief and mandamus, were authorized.[6]

The President utilized the new powers conferred by the Act "in order to stabilize the economy, reduce inflation, and minimize unemployment" and ordered, inter alia, the following economic guidelines in Executive Order 11615:

"Prices, rents, wages and salaries shall be stabilized for a period of 90 days from the date hereof at levels not greater than the highest of those pertaining to a substantial volume of actual transactions by each individual, business firm, or other entity of any kind during the 30-day period ending August 14, 1971, for like or similar commodities or services. If no transactions occurred in that period, the ceiling will be the highest price, rent, salary or wage in the nearest preceding 30-day period in which transactions did occur. No person shall charge, assess, or receive, directly or indirectly in any transaction prices or rents in any form higher than those permitted hereunder, and no person shall, directly or indirectly, pay or agree to pay in any transaction wages or salaries in any form, or to use any means to obtain payment of wages or salaries in any form, higher than those permitted hereunder, whether by retroactive increase or otherwise."[7]

The defendant school boards and the various intervenors and friends of the court urged that the Presidential Order has no application to the salary increases in question. Although the majority of the school teachers affected by the pay raise performed no actual work· at the increased salary before the freeze (summer vacation was in effect on the date of the raise), the defendants took the position that the factual circumstances surrounding the pay raise exempted the increased wages from the freeze.[8] In ruling on the legal propriety of the salary increases, this Court has considered the factual context of:

(1) the approval of the salary schedules at issue;

(2) the nature and terms of the employment of teachers in the respective school systems; and

(3) administrative documents providing guidelines for the implementation of Executive Order 11615.

and regulations may provide for the making of such adjustments as may be necessary to prevent gross inequities."

5. Sec. 203 of the Act provides "The President may delegate the performance of any function under this title to such officers, departments, and agencies of the United States as he may deem appropriate."

6. Sec. 205 of the Act provides that "Whenever it appears to any agency of the United States, authorized by the President to exercise the authority contained in this section to enforce orders and regulations issued under this title, that any person has engaged, is engaged, or is about to engage in any acts or practices constituting a violation of any regulation or order under this title, it may in its discretion bring an action, in the proper district court of the United States or the proper United States court of any territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond. Upon application of the agency, any such court may also issue mandatory injunctions commanding any person to comply with any regulation or order under this title."

7. Exec.Order No. 11615, Section 1(a), 36 Fed.Reg. 15727.

8. The Jefferson Parish School Board has approximately 2935 professional employees and approximately 2057 non-professional employees. On or before August 14, 1971, approximately 162 professional employees and approximately 670 non-professional employees were working and were entitled to wages pursuant to the 1971–72 salary schedule.

The Orleans Parish School Board has approximately 4,718 teacher-type employees and approximately 2,935 other employees. On or before August 14, 1971, approximately 201 teacher-type employees and approximately 1,575 other employees were working and were entitled to wages pursuant to the 1971–72 salary schedule.

## Approval of the Pay Raises

The increase in teacher salaries was mandated by the Louisiana Legislature by Act 397 of 1968.[9] That Act conferred a $1,600.00 per annum pay raise which was to be "(e)ffective not later than July 1, 1971. * * *" The Act provided for immediate gradual implementation of the salary increases with full implementation occurring not later than the 1971–1972 school year.

In order to effectuate the scheduled raises, the State Legislature appropriated funds in Item 31, section 19 of Louisiana Act 12 of 1971, which became effective on June 28, 1971. Subsequently, on July 14 and July 26 the Jefferson and Orleans Parish School Boards, respectively, approved the salary increases as required by state statute.

## Nature and Terms of School Board Employment

Legislative enactments provide that all parish school boards in Louisiana operate on a July 1 to June 30 fiscal school year.[10] Teaching personnel in the parish school systems are employed on the basis of a continuing employment arrangement; they do not sign annual contracts. Teachers serve a three year probationary term, after which, if not discharged as unsatisfactory, they become regular and permanent tenure teachers, subject to discharge for specified causes only.[11] Thus, any teacher in the parish school systems during the preceding 1970–71 school year, whether probationary or tenured, who was not discharged or who had not terminated his employment, continued automatically in the employ of the school board for the next school year beginning July 1, 1971.

It is apparent that teachers, though for the most part actively working only nine months a year, are regarded by the boards as continuous employees for a full twelve month fiscal term. Tenure requirements and budgetary arrangements testify to the perennial cycle utilized by the school boards. Therefore, July 1 is the beginning of the school year as regards fiscal matters, and especially, as regards a determination regarding salary increases.

## Administrative Guidelines

The Government at the trial took the position that only those teachers who were actually working for the increased salary prior to the 30-day period ending August 14, 1971 are entitled to be paid at the increased rate.[12] The narrow question thus became: Whether a teacher actually had to perform work at the higher salary rate prior to the freeze in order to reap the benefit of the raise.

This Court has considered a number of administrative guidelines which bear upon the issue. In order to assess the applicability of these guidelines it is necessary to review the brief history of agencies designated to implement the Executive Order. Section 3(a) of the Executive Order created the Cost of Living Council (COLC), a federal agency charged with the task of administration and enforcement of the Order. The COLC, in turn, delegated some of its functions to an existing federal officer, the Director of the Office of Emergency Preparedness (OEP).[13] The OEP thereafter assumed the responsibility for issuing regulations and guidelines in order to effectuate the mandates of the Executive Order.

The OEP promulgated *only one* Regulation pursuant to the Stabilization Act and Executive Order. Economic Stabilization Regulation No. 1[14] provides "initial guidance and procedures for implementing" the freeze. The Regulation

---

9. LSA–R.S. 17:421 (1968 Supp.).

10. LSA–R.S. 17:89.

11. LSA–R.S. 17:442–444.

12. See footnote 3, *supra.*

13. Cost of Living Order No. 1, 36 Fed.Reg. 16215.

14. 36 Fed.Reg. 16515.

clarified the content of the wage prohibition of the Executive Order as follows:

> "No employer shall pay and *no employee shall receive a wage,* salary, or other form of compensation *at a rate higher than that* paid or received or *in effect during the base period,* nor shall any person use any means to obtain payment of wages, salaries or other form of compensation higher than those permitted under the Executive Order of this regulation. Such remuneration shall be based upon a substantial number of actual transactions for services of like or similar nature.[15]

> \*    \*    \*    \*    \*    \*

> "Deferred wage or *salary increases* which were negotiated to take effect in the future, cost-of-living increases built into wage contracts or provided by management, and routine in-grade increases *not in effect* on or before August 14, 1971, *are not permitted* after August 15, 1971. Regardless of any right or contract heretofore or hereafter existing, no change or adjustment shall be made in rates of wages, salaries, or other forms of compensation whether by retroactive increase or otherwise." [16]    (Emphasis ours).

■    The Court, cognizant of the "great deference" afforded a departmental construction of its own enabling legislation,[17] feels that it is obliged to follow the clear dictates of Regulation No. 1.[18] The Court is also aware of its "ultimate responsibility" to construe the language of the statute (Executive Order) itself.[19] In this case, the Regulation seems perfectly consistent with the Order. Both sources prohibit an employee from receiving a wage at a rate higher than that in effect during the base period. It is the judgment of this Court that the disputed pay raises became operative on July 1, 1971 and were in fact in effect as of that date. Since the raises were in effect prior to and during the 30-day base period ending August 14, 1971, those raises are not prohibited by the Executive Order.

The Court's reliance on the language of the Order itself and the Regulation interpretive of the Order did not preclude careful consideration of other administrative pronouncements. Considerable attention was focused upon the meaning of "substantial number of actual transactions" as a determinative factor for computing a remunerative base figure for purposes of construing the Order. Different interpretations on this point were urged upon the Court. The Government argued in its brief that it is "patently clear" that this term was meant to apply almost exclusively to prices and is not applicable to teachers' pay raises. The Government's view was opposed by argument that the concept of substantial transactions was in fact relevant, in that over 10% of the school board employees in each parish were actually working before August 15 at the higher rate, and that since a significant percentage of employees were actually working, the test of "substantial transactions" applied in such a way as to validate the salary increases.

Though unwilling to confine the "substantial number of actual transactions" test to prices alone, the Court holds that standard to be inapplicable herein. It is the Court's opinion that the test of substantial transactions applies in instances in which varying rates of compensation were paid or received during the critical period. However, the test of substantial

15. Economic Stabilization Regulation No. 1, Section 2(b).

16. Economic Stabilization Regulation No. 1, Section 3(c).

17. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1964).

18. The Executive Order has the same effect as congressional legislation. Farkas v. Texas Instrument, Inc., 375 F.2d 629, 5 Cir., 1967; Farmer v. Philadelphia Electric Co., 329 F.2d 3, 3 Cir., 1964; Clark v. Local 189, United Papermakers and Paperworkers AFL–CIO, CLC, 282 F.Supp. 39, E.D.La.1968.

19. Zuber v. Allen, 396 U.S. 168, 193, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969).

transactions has no application where an increased and proportionately equal salary schedule was already *in effect* prior to and during the base period. Although "substantial transactions" certainly is applicable to the case of a merchant who sells articles at varying prices, that yardstick is not applicable to the case of teacher employees who receive by legislative mandate an equal and fixed percentage pay raise effective prior to the critical base period.

The Court has also considered detailed statements of policy, interpretations, and guidelines published in the Federal Register by the OEP as "Economic Stabilization Circulars". The parties devoted special attention to Circular No. 18 [20] which states that:

> "The date when a new pay rate went into effect or when a teacher signed a contract are not relevant in determining whether the higher salary level is applicable to the teacher."

Circular No. 18 apparently purports to provide that an individual teacher is entitled to a pay increase contracted for prior to August 15, 1971 only if he actually performed work prior to August 15 or was entitled to receive immediate payment of wages prior to August 15 at the increased rate.

The holding of the Court is apparently at variance with the Circular's guidelines, but for sound reasons. Regulation No. 1 is a more reliable indication of the meaning of the Executive Order than is Circular No. 18. The following language contained in the Circular places the document in its proper perspective:

> "This circular is designed for general information only. The statements herein are intended solely as general guides drawn from OEP Economic Stabilization Regulation No. 1 and from specific determinations and policy statements by the Cost of Living Council and do not constitute legal rulings applicable to cases which do

not conform to situations clearly intended to be covered by such guides.

> "Note: Provisions of this and subsequent circulars are subject to clarification, revisions and revocation."

■ The Circular is in conflict with Regulation No. 1 in that the Circular purports to remove from consideration the clear "effective date" provision of the Regulation. Insofar as such conflict exists, the Circular is subordinate to the Regulation and conflicts with the Regulation on the question of effective date of wage increases. The only proper solution to this conflict is to rely upon the clear provisions of Regulation No. 1.

Furthermore, the Government's guidelines by circulars have been far from consistent. Several circulars were issued which purported to provide "guidance" on the issues of teachers' salaries. Circular No. 1 provided that "increases in the salaries of teachers may be granted if the contract period started before August 15". [21] Circular No. 5 added a new element, stating that increases may be paid if the contract period began prior to August 15 and if at least one teacher covered by the contract worked at the new rate prior to August 15. [22] Circular No. 13 countermanded this determination and declared that whether any teacher worked prior to August 15 at the new rate was "irrelevant". [23] Next issued on the subject of teachers' raises was Circular No. 18, *supra*. Suffice it to say that the brief history of the OEP Circulars pertinent to teachers' salaries reveals contradictory and inconsistent interpretations of the application of the Regulation and Order.

The Court recognizes the difficulty incumbent in the administration of the Stabilization Act and Executive Order. The Court takes notice that the federal agencies responsible for this gargantuan task have been swamped with myriad requests for administrative determinations and have been beset from all directions with inquiries as to the specific applica-

20.  36 Fed.Reg. 19311.

21.  36 Fed.Reg. 16587.

22.  36 Fed.Reg. 17437.

23.  36 Fed.Reg. 18530.

tion of the wage-price freeze. Conflicting guidelines are perhaps inevitable because of the immediacy and urgency of the administrative inquiries. Nevertheless, the Court cannot elevate to the level of enforceable law the inconsistent and contradictory directives provided by the various Circulars. Instead, the Court will adhere to Regulation No. 1 as properly interpretative of the Executive Order.[24]

For the foregoing reasons, the Government's suit to enjoin the School Boards of Orleans and Jefferson Parish from implementing recently enacted increases in teachers' salaries is hereby dismissed.

24. See Zuber v. Allen, *supra*.