**UNIVERSITY OF SOUTHERN CALIFORNIA, a nonprofit corporation, Plaintiff,**

v.

**COST OF LIVING COUNCIL and Office of Emergency Preparedness, Agencies of the Government of the United States of America, Defendants.**

Civ. No. 71–2426.

United States District Court,
C. D. California.

May 12, 1972.

———◆———

Musick, Peeler & Garrett by Gerald G. Kelly, James B. Bertero, Robert J. Heil, Los Angeles, Cal., for plaintiff.

William D. Keller, U. S. Atty. by Frederick M. Brosio, Jr., Chief of Civil Division by Matthew A. Schumacher, Asst. U.S. Atty., Los Angeles, Cal., for defendants.

## MEMORANDUM OF DECISION

WILLIAM P. GRAY, District Judge.

The University of Southern California (USC), the plaintiff in this action, seeks, among other things, a summary judgment declaring that its prices for tickets to its 1971 football games were not in violation of the Phase I "price freeze" that was promulgated by Executive Order No. 11615, signed by the President on August 15, 1971 (36 Fed. Reg. 15727). The defendants, through the United States Attorney and representatives of the Department of Justice, agree with the plaintiff as to the facts and, therefore, that this is a proper case for summary judgment; but they contend that such facts constitute violation of the subject Executive Order.

For reasons hereinafter set forth, the declaratory relief sought by the plaintiff will be granted.

Executive Order No. 11615 decreed, in effect, that for a period of 90 days following the date of the Order (August 15, 1971), prices were to be stabilized " . . . at levels not greater than the highest of those pertaining to a substantial volume of actual transactions by each individual, business, firm, or other entity of any kind during the 30-day period ending August 14, 1971, for like or similar commodities or services. If no transactions occurred in that period, the ceiling will be the highest price . . . in the nearest preceding 30-day period in which transactions did occur."

On January 28, 1971, the appropriate authoritative body of USC by formal resolution voted that the prices of reserved seats for each of its home football games in 1971 would be increased by 50 cents above those charged during the 1970 football season. On about April 30, 1971, USC distributed printed brochures that announced the 1971 football schedule and solicited the purchase of tickets for reserved seats, at the increased price, on a season ticket basis or for individual games. Before July 16, 1971 (the beginning of the 30-day base period established by the Executive Order), USC had sold and received payment for about 125,000 tickets to the six home games on a season basis and several thousand additional tickets to individual games. During the 30-day base period (July 16 to August 14), USC sold about 5,000 more tickets. Five of the six home games were played during the 90-day "freeze" established by the Executive Order; the last game was played on November 20, 1971.

On about October 5, 1971, the defendants notified USC that the price increase was in violation of the Executive Order and have demanded that refunds of 50 cents per ticket be made to all purchasers thereof.

The obvious purpose of the Executive Order was to stabilize prices as of the date of that order, August 15, 1971, and thus to prohibit sellers from increasing their prices beyond those charged prior to that date. There is no suggestion in the order or in the administrative regulation based upon it (Economic Stabilization Reg. No. 1, 36 Fed.Reg. 16515, August 21, 1971) that such controls would have retroactive effect and require refunds of prices charged in trans-

actions that antedated the Executive Order.

The defendants insist, however, that their demand does not involve retroactivity. They contend that the "transactions" affected by the order were not the sales of tickets but, instead, were the playing of the games. According to the defendants, inasmuch as there were no such "transactions" during the base period (July 16 to August 14, 1971, inclusive), the 1971 prices may not exceed those of the 1970 football season, which was the "nearest preceding 30-day period in which transactions did occur," as required by the Executive Order.

The fundamental legal issue in this case is the meaning of the word, "transactions," as it is used in the Executive Order and the ensuing regulations. If the defendants are correct in their interpretation, USC would be compelled to attempt to return to each of the many thousands of purchasers of its tickets a small portion of the money that it charged, fully collected, and at least partially spent or committed well before August 15, 1971 (the date of the Executive Order). The increases in prices presumably were made in good faith and at a time when the President was insisting that he would not impose price controls, despite the authorization thereof by Congress in August of the preceding year.* No amount of interpretation or rationalization can remove the retroactive nature of the burden that the defendants here seek to impose.

In support of their contention that the "transactions" here concerned were the playing of the games, the defendants refer to the fact that the Executive Order and Economic Stabilization Regulation No. 1 (36 Fed.Reg. 16515, August 21, 1971) pertain to "transactions" involving prices for *commodities* and *services*. They then assert that the playing of the football games constitutes the rendering of services, and they refer to OEP Economic Stabilization Circular No. 7, which rules that "In the case of a service, the transaction takes place when the service is performed." (36 Fed.Reg. 17578, September 2, 1971).

■ The playing of a football game is hardly synonymous with the rendering of services, as that term is used in the Executive Order and the formal implementing regulation, as well as in normal parlance. A tackle on the USC Varsity would be surprised to hear the thought expressed that his performance in a game is in fulfillment of his employment to provide a service for the spectators as his customers or clients, comparable to services rendered by an electrician or a lawyer. The goal (at least the acknowledged goal) of a college football player is to represent his school as a member of the team and to help win the game and perhaps the championship. The ticket holders are incidental; and the game presumably would be played with comparable motivation whether or not there were spectators in attendance. It is relevant to note that many intercollegiate athletic contests are held and earnestly fought virtually without paying spectators.

The plaintiff points out that the purchaser of a season ticket, rather than contracting for future services, is completing a transaction in which he gives and receives value. He obtains the right to view the games from a particular reserved seat, and his name is put on a preference list which accords him the availability of progressively better seats in successive seasons. In return, he pays the full purchase price without any right to a refund, and the games are played whether or not he is present.

In view of all of the foregoing, I am not able to accept the defendants' contention that we are here concerned with service contracts and that the pertinent transactions therefore occurred with the playing of the games rather than the selling of the tickets.

However, the defendants' demand upon the plaintiff is supported by OEP

---

* See Economic Stabilization Act of 1970, P.L. 91-379, Title II, 84 Stat. 796.

Economic Stablization Circular No. 11 (36 Fed.Reg. 18315, September 11, 1971), which asserts that "The freeze applies to prices of advance sale tickets for sporting events occurring during the freeze." It must now be considered whether or not such a statement should be deemed controlling.

Apart from what seems to me to be the absence of any justification for such a conclusion on the ground that the sporting event itself is the "transaction" in the form of rendering of services, application here of the above quoted assertion from Circular No. 11 has another major defect. It gives insufficient significance to the fact that full payment for the tickets here concerned was made before the price freeze was announced, and that to require the refunds would involve the inequity of retroactivity.

As is mentioned earlier in this memorandum, nothing in the Executive Order or in Economic Stabilization Regulation No. 1 (36 Fed.Reg. 16515, August 21, 1971) suggests restrictions on anything other than prospective charging and payment of prices. It is true that contracts entered into before the wage freeze and which provided for increases of compensation to be paid for future services have been held to be affected by the Executive Order here concerned, because "contracts do not fetter the constitutional authority of Congress." Amalgamated Meat Cutters and Butcher Workmen of North America, A.F.L.–C.I.O. v. Connally, 337 F.Supp. 737, 763 (3-judge Court, D.C.1971). However, there, the Executive Order was issued before any work or payment under the contract occurred, a situation quite different from the one here concerned, where full payment for the tickets had already been received.

On other occasions the Cost of Living Council has published circulars that are inconsistent with Circular No. 11 with respect to the effect of the Executive Order upon prices charged and received before the date of that order. On August 18, 1971, the Council published its "Question and Answer List #1," which contained the following:

"Q. Are previously announced increased tuition rates for the 1971–72 school year permitted by the freeze?

"A. Yes. These are considered transaction prices, *since commitments have been made and there are a number of cases where payments have been made.*" (Emphasis added).

One week later, the following interpretation was issued:

"Q. Are college and school room and board rates exempt from the freeze?

"A. No. School and college room and board payments are handled just like tuition. If there were substantial transactions during the base period (*confirmed by deposits*), the increase may be charged. If there was not a substantial volume, the increase is not allowed." CLC Questions & Answers List #6, August 25, 1971; see also OEP Circular No. 101, § 403(9). (Emphasis added).

Neither the Executive Order nor Regulation No. 1 suggests any reason why prepayment for the right to see a college football game should be treated any differently than prepayment of tuition or of room and board.

█ It is the conclusion of this court that the hereinabove quoted provision of Circular No. 11 should not be given effect in this case because it is not in harmony with the purposes and provisions of the Executive Order and Regulation No. 1 and is inconsistent with other rulings of the Cost of Living Council.

The attitude in which this decision is reached is in full accord with a concluding comment by Judge R. Blake West in his opinion in United States v. Jefferson Parish School Board, 333 F.Supp. 418, 423 (E.D.La.1971), which involved a closely related problem:

"The Court recognizes the difficulty incumbent in the administration of the Stabilization Act and Executive Order. The Court takes notice that

the federal agencies responsible for this gargantuan task have been swamped with myriad requests for administrative determinations and have been beset from all directions with inquiries as to the specific application of the wage-price freeze. Conflicting guidelines are perhaps inevitable because of the immediacy and urgency of the administrative inquiries. Nevertheless, the Court cannot elevate to the level of enforceable law the inconsistent and contradictory directives provided by the various Circulars. Instead, the Court will adhere to Regulation No. 1 as properly interpretative of the Executive Order."

Judgment will issue declaring that the prices of the plaintiff's sales of tickets for its 1971 football season were not in violation of Executive Order No. 11615.