**UNIVERSITY OF SOUTHERN CALI-FORNIA, a nonprofit corporation,**
Appellee,

v.

**COST OF LIVING COUNCIL and Office of Emergency Preparedness, Agencies of the Government of the United States,**
Appellants.

No. 9–1.

Temporary Emergency Court of Appeals.

Sept. 18, 1972.

Rehearing Denied Nov. 8, 1972.

Certiorari Denied Feb. 20, 1973.
See 93 S.Ct. 1364.

William E. Nelson, Washington, D. C. (Harlington Wood, Jr., Washington, D. C., William D. Keller, U. S. Atty., Los Angeles, Cal., William C. McCorriston, San Marino, Cal., Joseph DiStefano, Washington, D. C., on the brief), for appellant.

Jeffrey A. Berman, Los Angeles, Cal. (Musick, Peeler & Garrett, Gerald G. Kelly, Robert J. Heil, and James B. Bertero, Los Angeles, Cal., on the brief), for appellee.

Before TAMM, Chief Judge, and CARTER and CHRISTENSEN, Judges.

TAMM, Chief Judge.

■ Appellee, the University of Southern California (USC), on October 7, 1971, initiated suit in the district court seeking to restrain appellant agencies from instituting any action over USC's increase in its reserved seat ticket prices for the 1971 football season. Appellants, the Cost of Living Council (CLC), and the Office of Emergency Prepared-

ness (OEP), had informed USC that the price increase violated the wage-price freeze announced by President Nixon on August 15, 1971. On May 12, 1972, the district court, 342 F.Supp. 606, finding that there were no material issues of fact and that appellee was entitled to judgment as a matter of law, granted appellee's motion for summary judgment. For the reasons stated below, we reverse the decision of the trial court, and remand for further proceedings consistent with this opinion.

## I. FACTS

On January 28, 1971, USC's "Ticket Committee" met and by official resolution increased the price of reserved seats for each home football game by 50¢ above the 1970 level. This resulted in an increase to $6.50 per ticket for all games in the 1971 season with the exception of the gridiron classic, the USC–UCLA game, for which the ticket price was increased from $7.00 to $7.50. Prior to July 16, 1971 (the beginning of the thirty-day "base period" established by the President's Order) approximately 127,500 tickets were sold for games to be played during the freeze period (August 15 through November 13, 1971). During the thirty-day base period an additional 5,000 tickets were sold. Ultimately a total of 176,099 reserve seat tickets for the games in question were sold at the increased rate, placing the amount in controversy in excess of $88,000.[1]

Executive Order No. 11615 (Order), 3 C.F.R. 199 (1971), issued on August 15, 1971, "froze" the prices that could be charged for commodities and services to levels in existence at certain periods prior thereto. On October 5, 1971, USC's business office was notified by the OEP that the ticket price increase was not in compliance with the Order, that the

prices would have to be reduced to the levels in existence during the 1970 season, and that "refunds to those who have purchased tickets for played games [the Alabama and Illinois games, on September 10 and 25, respectively] as well as for future games" were in order. If such actions were not carried out by USC, the OEP warned that "further action by the government [would] be required."[2] Two days later the declaratory judgment action in the district court was filed, seeking to restrain the CLC and OEP from instituting any action against USC for its refusal to discontinue selling tickets at the reduced rate, or refund any amounts already received.

## II. EXECUTIVE ORDER 11615 AND ITS PROGENY

When President Nixon initially addressed the nation concerning the matter of economic controls, he spoke of taking decisive action to "break the vicious circle of spiraling prices and costs," and ordered a "freeze on all prices and wages throughout the United States for a period of 90 days." Executive Order No. 11615, issued concurrently with the President's address and under the authority of the Economic Stabilization Act of 1970,[3] was the means to that end. The regulatory section of the Order was but one paragraph in length, and provided:

Section 1. (a) Prices, rents, wages and salaries shall be stabilized for a period of 90 days from the date hereof at levels not greater than the highest of those pertaining to a substantial volume of actual transactions by each individual, business, firm or other entity of any kind during the 30-day period ending August 14, 1971, for like or similar commodities or services. If no transactions occurred in that peri-

---

1. *See* affidavits attached to USC's Motion for Summary Judgment, No. 71–2426–WP6, March 1, 1972.

2. The notification was in the form of a telegram from Ralph D. Burns, Regional Director, Office of Emergency Prepared-

ness, to Mr. Elkin D. Phillips of the USC Business Office.

3. P.L. 91–379, 84 Stat. 799 (1970); P.L. 91–558, 84 Stat. 1468 (1970); P.L. 92–8, 85 Stat. 13 (1971); P.L. 92–15, 85 Stat. 38 (1971); subsequently amended P.L. 92–210, 85 Stat. 743 (1971).

od, the ceiling will be the highest price, rent, salary or wage in the nearest preceding 30-day period in which transactions did occur. No person shall charge, assess, or receive, directly or indirectly in any transaction prices or rents in any form higher than those permitted hereunder, and no person shall, directly or indirectly, pay or agree to pay in any transaction wages or salaries in any form, or to use any means to obtain payment of wages or salaries in any form, higher than those permitted hereunder, whether by retroactive increase or otherwise.

The Order further established a Cost of Living Council, to which was delegated all of the President's power under the *Economic Stabilization Act of 1970*, and the power to issue rules and regulations, prescribe definitions, and grant exemptions. Thus the task of filling in the interstices of the skeletal outline provided by the Order, and of literally injecting life into the program, was consigned to the CLC.[4]

The CLC, on August 17, 1971, in Cost of Living Order No. 1, 36 Fed.Reg. 16215 (Aug. 20, 1971), effectively delegated the above powers to the Director of the Office of Emergency Preparedness. The Director promptly issued, on August 20, 1971, Economic Stabilization Regulation No. 1 (hereinafter "Regulation"), 32A C.F.R. 35 (1972), which, as amended, became the only "regulation" issued throughout the 90 day freeze. The Regulation, itself very brief and basic in content, had as its stated purpose providing the "initial guidance and procedures for implementing the stabilization of prices . . . . " On August 24, 1971, the first amendment to the Regulation was published in the Federal Register stating, *inter alia*, that "OEP shall from time to time issue circulars containing implementing instructional material which shall be set forth in Appendix I to this

regulation." E.S.Reg. 1, § 11(b), 32A C.F.R. 39 (1972). Between August 24 and November 13, 1971, twenty-six such circulars were issued and published.

All circulars contained the following statement of purpose:

This circular is designed for general information only. The statements herein are intended solely as general guides drawn from OEP Economic Stabilization Regulation No. 1 and *from specific determinations by the Cost of Living Council* and do not constitute legal rulings applicable to cases which do not conform to the situations clearly intended to be covered by such guides.

Note: Provisions of this and subsequent circulars are subject to clarification, revision, or revocation.

(Emphasis supplied.)

Circular No. 7, published September 2, provided in pertinent part:

A transaction takes place when the seller ships the product to the buyer, not when the order is received. *In the case of a service, the transaction takes place when the service is performed.*

(36 Fed.Reg. 17578, Sept. 2, 1971) (emphasis supplied).

Circular No. 11, published September 11, 1971, provided in pertinent part:

The freeze applies to prices of advance sale tickets for sporting events occurring during the freeze.

(36 Fed.Reg. 18315, Sept. 11, 1971).

Nowhere in the Order, Regulation, or circulars is there an express denomination of a sporting event as a "service," nor in the Order or Regulation is there a definition of "transaction."

■ The district court found the "fundamental legal issue in this case [to be] the meaning of the word, 'transactions,' as it is used in the Executive Order and the ensuing regulations." Uni-

---

4. Section 4(a) of the Order provides: "The Council, in carrying out the provisions of this Order, may (i) prescribe definitions for any terms used herein, (ii) make exceptions or grant exemptions, (iii) issue regulations and orders, and (iv) take such other actions as it determines to be necessary and appropriate to carry out the purposes of this Order."

versity of Southern California v. Cost of Living Council, 342 F.Supp. 606, 608 (C.D.Cal.1972). While USC urged that the transaction involved was the sale of the tickets, the OEP and CLC opined that the sale of the tickets was merely preparatory to the performance of a *service*, namely the playing of the football game, and that as "[i]n the case of a service the transaction takes place when the service is performed," USC would be obliged to look to the 1970 football season for its ceiling price. That is, since no transactions—football games—occurred during the 30-day period ending August 14, 1971, the ceiling would have to be "the highest price . . . in the nearest preceding 30-day period in which transactions did occur." Executive Order No. 11615, *supra*.

The district court flatly rejected the agencies' position and ruling, finding "no suggestion in the order or in the administrative regulation based upon it . . . that such controls would have retroactive effect and require refunds of prices charged in transactions that antedated the Executive Order." The court rebuffed the contention that the "pertinent transactions" took place with the playing of the games rather than the selling of the tickets, and found Circular No. 11 "not in harmony with the purposes and provisions of the Executive Order and Regulation No. 1" and "inconsistent with other rulings of the Cost of Living Council." 342 F.Supp. at 607–608, 609.

### III. SCOPE OF REVIEW

The Executive Order of August 15 left the Cost of Living Council (and by its delegation the Office of Emergency Preparedness) with a "gargantuan" task.[5] In delegating to the agencies the duty to develop the very definitions of the words used in the Order, the broadest possible delegation of power was given. As this court recently stated in United States v. Lieb, 462 F.2d 1161 (Em.App., 1972):

> The President has made the *broadest delegation of power to the Council*, allowing it to use its own discretion as to the best means of achieving the purposes of the Executive Order, which are "to stabilize the economy, reduce inflation, and minimize unemployment [by stabilizing] prices, rents, wages, and salaries."

(462 F.2d at 1166, emphasis supplied).

It is a well settled principle that the courts place great weight on the interpretations given to statutes and regulations by those agencies charged with the responsibility of administering them. *See, e. g.*, Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), and the cases cited therein. This "great deference test," analyzed thoroughly by both parties to this lawsuit and specifically recognized by this court in *Lieb*, is particularly appropriate when, as here, the administrative practice at stake "involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." Power Reactor Development Co. v. Int. Union of Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961).

We can propound no situation more compelling for the application of the "great deference test" than that presently before us. Only the barest foundation has been laid by the Executive Order—the definitions of such key words as "prices," "rents," "salaries," "sub-

---

5. The branding of the burden facing appellants as "gargantuan" is taken from United States v. Jefferson Parish School Board, 333 F.Supp. 418, 423–424 (E.D. La.1971): "The Court recognizes the difficulty incumbent in the administration of the Stabilization Act and Executive Order. The Court takes notice that the federal agencies responsible for this gargantuan task have been swamped with myriad requests for administrative determinations and have been beset from all directions with inquries as to the specific application of the wage-price freeze."

stantial volume," "commodities," "services," and, yes, "actual transactions," have been left to the CLC and the OEP. Their determinations—subject to the constant limitation of reasonableness in accomplishing the purposes of the Order—set the depth and breadth of the controls.

Appellee would have us abrogate and abandon the deference owed to the administrative rulings for a variety of reasons—among them the "haste" and lack of "accumulated administrative expertise" under which the rulings were issued. As to the latter, the CLC, whose rulings comprised the foundational material for circulars issued by the OEP, had in its membership the Secretaries of Treasury, Agriculture, Commerce, Labor, the Director of the Office of Management and Budget, the Chairman of the Council of Economic Advisers, and the Special Assistant to the President for Consumer Affairs. Executive Order No. 11615, § 2(b), *supra*. These are men of no little "administrative expertise," and men who in fact occupy such positions as to known better than most the causes of inflation, the reasons for the freeze, and the purpose and intent of the Executive Order.

As to "haste," the freeze itself, if it was to be effective, had to be implemented fully and immediately. Rules, regulations, and crucial definitions had to be issued. Haste was not a vice but a virtue, and the waste and inconsistencies that usually accompany it were probabilities, not mere possibilities. This court cannot and will not close its eyes to the realities of the situation facing the agencies. If the haste necessitated gave rise to unreasonable inconsistencies in the administrative interpretations, or to ac-

tions plainly without the purpose and scope of the Order, then we will readily rectify them. We will not, however, absent actions akin to the above, substitute our views for those of the agencies. According deference to an agency's interpretations is not allowing government by "bureaucratic fiat," it is avoiding government by "judicial fiat." [6]

## IV. REFUND

The trial court determined that the "retroactive nature of the burden" that the CLC and OEP seek to impose by requiring a refund was unsanctioned by the Executive Order. The court stated that the

> obvious purpose of the Executive Order was to stabilize prices as of the date of that order . . . and thus to prohibit sellers from increasing their prices beyond those charged prior to that date. There is no suggestion in the order or in the administrative regulation based upon it . . . that such controls would have retroactive effect and require refunds of prices charged in transactions that antedated the Executive Order.

(342 F.Supp. at 607–608).

In a sense it does not appear necessarily that the controls involved here were applied retroactively; if we are correct in our view that the actual transactions (or services) were the exhibitions of the games in question to spectators who had then or theretofore paid and been given admission, such transactions did not actually occur until after the issuance of the Executive Order. Be that as it may, in our opinion in the context here, we believe that the power of giving the controls effect, notwithstanding prior

---

6. We find the language of Unemployment Compensation Comm'n v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946), although arising in the context of an administrative body's interpretation of a state statute, to be most relevant to this situation: "Here, . . . the question presented 'is one of specific application of a broad statutory term in a proceeding in which the agency adminis-

tering the statute must determine it initially.' To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings. The 'reviewing court's function is limited.' "

ticket sales, was vested in the administrative agency.

The Economic Stabilization Act of 1970 gave to the President the plenary power to stabilize prices "at levels not less than those prevailing on May 25, 1970." The Order and interpretive rulings with which we are concerned clearly fall within the limits of this mandate. The right of the Government to apply the freeze to existing contracts, a right which has not been seriously disputed, has been expressly recognized of late in Amalgamated Meat Cutters & Butcher Workmen v. Connally, 337 F. Supp. 737 (D.D.C.1971). The fact that payment has been received for an event to be performed in the future does not alter this "doctrine of impairability." As in other contexts the date of performance of the "service" may. be given effect as the determinative of the time governing the application of the price ceilings, as more fully discussed hereinafter.

■ The power of the district court to order a refund in the proper situation is evident. Section 7 of the Order provided two express sanctions for violations of the Order (or rules or regulations issued under authority of the Order)—a fine, and a request by the CLC for the Department of Justice "to bring actions for injunctions authorized under Section 205 of the Economic Stabilization Act of 1970." Section 205 of the Act, in addition to providing for a permanent or temporary injunction or restraining order, also states that "[u]pon application of the agency, any such court may also issue mandatory injunctions commanding any person to comply with any regulation or order under this title."

The power to issue mandatory injunctions includes the power to order restitution or refund of funds held in violation of the regulations and rulings of the CLC and the OEP. *See* Porter v. Warner Holding Co., 328 U.S. 395, 399–400, 66 S. Ct. 1086, 1089–1090, 90 L.Ed. 1332 (1946), which considers such a power both "an equitable adjunct to an injunction decree," and "appropriate and necessary to enforce compliance" with the governing Act (then the Emergency Price Control Act of 1942); United States v. Lieb, *supra,* where an order for restitution was enforced.[7]

Once again we must repeat that we are faced with the broadest of delegations of authority, delegation that carried with it the power to "take such . . . actions as [the CLC] determines to be necessary and appropriate to carry out the purposes of the Order." [8] That such a broad grant of power contains within it the authority to require refunds in situations such as this in order to give maximum effect to the wage-price freeze seems totally reasonable. While this court recognizes the considerable burden that such a refund demand places upon USC,[9] we recognize also the right of the agencies to require it. Faced with what we believe to be no clear showing that the Order denies such a power, and faced with the broad grant of authority to the agencies under which such a power can readily be implied, we find the power to demand such a refund properly at the appellants' disposal.

Yet even when such a power does exist, it must be exercised only when so doing manifests a reasonable interpretation of the Executive Order. Here again, ap-

---

7. Empowering the courts to mandate "any person to comply with any regulation or order," necessarily includes requiring an offender to conform his conduct to the law. Requiring restitution places him in the fiscal position which he would have occupied but for his violation.

8. *Supra* note 4.

9. Although appellee in its brief asserts that it does not raise "inequity" as a defense to the agencies' action, we feel

this played an important role in the trial court's determination, and make reference to Amalgamated Meat Cutters & Butcher Workmen v. Connally, 337 F.Supp. 737, 758 (D.D.C.1971): "[B]road emergency price control measures need not entitle each particular seller to consideration of the equity of his position, for such an obligation would impose an administrative impracticability that would defeat the very purpose of the Act."

pellee and the district court find fault with the appellants' actions. Repelling at the CLC and OEP interpretation of "transaction" as taking place when the football game is actually performed, as opposed to when the tickets are sold, the appellee brands such action as evidence of an inconsistent and unreasonable interpretation. Recognizing the deference due and owing the agencies' interpretations and rulings, we respectfully disagree.

## V. TRANSACTION

Although the Executive Order and Regulation contained no definition of "actual transaction," Circular No. 1, appearing in the Federal Register only nine days after the Order issued, stated at § 401(d):

> The ceiling price for the sale of a commodity or service is the highest price at which a seller *delivered* or *furnished* during the base period such *commodity* or *service* to purchasers in a substantial number of transactions
>
> . . . .
>
> (36 Fed.Reg. 16586, Aug. 24, 1971) (emphasis supplied).

This idea of delivery or performance as constituting the incident of "transactions" runs throughout the circulars. Circular No. 7, published only nine days later, made clear that in the case of a sale of a commodity "[a] transaction takes place *when the seller ships the product to the buyer, not when the order is received.*" As to a service, the circular asserted the completely consistent position that "[i]n the case of a service, the transaction takes place *when the service is performed.*" 36 Fed.Reg. 17578 (Sept. 2, 1971) (emphasis supplied). Orders received for goods on which delivery was yet to be made at the time of the freeze could not be considered "transactions" for purposes of establishing a ceiling price. In some instances, as here, it was necessary to go back a year in time to find "transactions" from which a ceiling price could

be established. For example, when discussing the sale of "holiday specialty items," Circular No. 102,[10] 32A C.F.R. 55 (1972), published on October 22, 1971, stated at § 303(2):

> Candy manufacturers who make specialized holiday candies for occasions such as Halloween, Thanksgiving, and Christmas must use the prices of the last shipments of such candies—probably those made last year prior to the special events involved—to establish their ceiling prices.

The provision of Circular No. 14, 36 Fed.Reg. 18654 (Sept. 18, 1971), that an order *plus* deposit does not constitute a transaction price for purposes of establishing the ceiling, absent delivery, and of Circular No. 16, 36 Fed.Reg. 19030 (Sept. 25, 1971), that work in progress "preparatory to provision of the final service does not qualify as a transaction" are also consistent with appellants' usage of the term in relation to advance sale of season tickets. Until the ultimate service is performed, no "transaction" takes place.

Appellee singles out only one position of the agencies contrary to the above, and that relates to the very specialized area of education. It is interesting to note that the agencies themselves admitted the "uniqueness" of their position regarding education (which allowed previously announced tuition, board and room increases to go into effect although the performance of the "service" in most instances did not occur until after the freeze began) in Circular No. 15, § 403 (1), 36 Fed.Reg. 18867 (Sept. 23, 1971):

> This treatment of the student-school relationship is unique to tuition and room and board transactions and does not apply to any other form of transactions.
>
> .   .   .   .   .   .
>
> The use of prior announcement and payment to show completion of transactions results from the unique arrangement schools have with their en-

10. Following Circulars Nos. 1–10, a superseding compilation of all ten circulars, Circular No. 101, 32A C.F.R. 39 (1972), was published. Following Circular Nos. 11–20, Circular No. 102 was published in like manner.

rolled students. Although the level of service performed by schools varies with the school year, certain year-round services are available to enrolled students. . . .

In light of tuition's short-lived total exemption from the price freeze, and the particularly singular nature of education as a whole, we do not find the agencies' actions regarding the definition of "transaction" for tuition, room and board in the area of education to be necessarily unreasonable.[11]

Thus, we find the agencies' implied assertion that a sporting event constituted a service,[12] the performance of which only could be considered a "transaction" for purposes of setting the base period ceiling price, and hence that "the freeze applies to prices of advance sale tickets for sporting events occurring during the freeze," to be a reasonable and consistent interpretation of the Executive Order, and one entitled to this court's respect.

The appellee's final argument, that the agencies' altering of the "transaction" definition in its administration of Phase II (so as to include the advance sale of tickets) should somehow influence our judgment as to the initial application is ill-founded. It is not unlikely that a justifiable change in policy considerations brought about the Phase II alterations, or perhaps the agencies recognized a better method, each of which is an administrative prerogative. However, that does not mean that their original actions were unreasonable, or not entitled to the deference this court has determined is due.

## VI. CONCLUSION

The action of the district court in granting appellee's motion for a summary judgment, thus restraining the appellants from initiating action to enforce compliance with Executive Order 11615, as interpreted, is hereby reversed, and remanded for further proceedings consistent with this opinion.

11. Pursuant to the authority delegated to it to grant "exemptions," the CLC in Regulation No. 1 initially exempted raw agricultural products, stocks and bonds, exports, and school tuition. Executive Order No. 11615, § 4(a), 3 C.F.R. 199 (1971); CLC Reg. No. 1, § 4(b), 36 Fed. Reg. 16515 (Aug. 21, 1971). Three days later, in CLC Reg. No. 1, Amdt. No. 1, 36 Fed.Reg. 16585 (Aug. 24, 1971), the exemption for school tuition was removed. The circulars subsequently issued continued the CLC's specialized treatment of the school tuition problem.

Finding as we do that any inconsistencies in interpretation are reasonable, a thorough discussion of United States v. Jefferson Parish School Board, 333 F.Supp. 418 (E.D.La.1971) is not required. *Jefferson* concerned the troublesome problem of whether contracted teacher wage increases that took effect prior to the price freeze could continue, although services rendered by the teachers did not begin until during the freeze. The CLC and OEP issued several inconsistent circulars regarding this one issue, and the Louisana federal district court determined

that the language of the Regulation (which in the court's opinion allowed the increase to stand) should prevail. While reserving judgment on the merits of *Jefferson*, we find it clearly distinguishable from the present situation. Here no conflict exists between the Order, Regulation, and circulars, and it is between distinct areas of control that any inconsistency in the circulars arises.

12. As stated early in this opinion, nowhere in the Order, Regulation, or circulars can there be found a definitive statement that sporting events qualify as services. While it is with no small difficulty that sporting events can be fit within the Regulation definition of services, the agencies from a very early date impliedly treated them as such. That a multi-million dollar enterprise should be so classified does not appear to this court to be unwarranted, or unreasonable. The Regulation was issued but nine days after the Executive Order, and because of its very compact nature should be read, wherever feasible, in light of the circulars with as much latitude as possible.