**OAKLAND RAIDERS, etc., Plaintiff,**

v.

**OFFICE OF EMERGENCY PREPARED-NESS et al., Defendants.**

**No. C–71–2213 RFP.**

United States District Court,
N. D. California.

Jan. 2, 1974.

Hardin, Cook, Loper & Martin, Oakland, Cal., for plaintiff.

L. Patrick Gray, Asst. Atty. Gen., Washington, D. C., James R. Browning U. S. Atty., Wm. B. Spohn, Asst. U. S. Atty., San Francisco, Cal., Wm. E. Nelson, Wm. C. McCorrison, Attys., Dept. of Justice, for defendants.

## MEMORANDUM AND ORDER

PECKHAM, District Judge.

Plaintiffs Oakland Raiders (Raiders) brought this action seeking a declaratory judgment that their increase in ticket prices for the 1971 football season did not violate the so-called "wage-price freeze" imposed by the President on August 15, 1971. The action came on for hearing before the court on September 17, 1973, on a motion for summary judgment by the defendants, namely, the Office of Emergency Preparedness (OEP), Cost of Living Council (COLC), and Ralph D. Burns.

In early 1971, the Raiders sent out renewal applications to all their season ticketholders from the previous year; all ticket prices had been increased over the 1970 prices. By late June, over 48,000 season tickets (out of a total sta-

dium capacity of 54,000) had been purchased and paid in full. These tickets were mailed to the purchasers in late July.

On August 9 and 14, 1971, the Raiders played their first two exhibition games of the 1971 season at home. On August 15, the President issued Executive Order 11615, (36 Fed.Reg. 15727), proclaiming the "wage-price freeze"; the legal basis for the freeze was found in the Economic Stabilization Act of 1970, P.L. 91–379, 84 Stat. 799. The Raiders subsequently played two more exhibition games at home, then in October played three regular season home football games at ticket prices that were $.50 over those charged for the exhibition games. Thereafter, during Phase II, the Raiders played four additional home games.

Under the provisions of Executive Order 11615, prices were to be stabilized at a level not exceeding the highest prices pertaining to a substantial volume of actual transactions during the 30-day "base period" ending August 14, 1971.

■■ Defendants appear to concede, as indeed they must, that the playing of two exhibition games during the "base period" prior to August 15 was sufficient to legitimize the increase over 1970 prices; and defendants further appear to concede that the further increase in ticket prices for regular season games over the price charged for exhibition games was legitimate under the Phase II guidelines as to all games after November 13, 1971. Thus the primary point of contention seems to be the validity of the $.50 price increase for the three regular season home games played during October 1971.

Regulations issued by the OEP in Economic Stabilization Circular No. 11, 36 Fed.Reg. 18315 (September 11, 1971), provide that "the freeze applies to prices of advance sale tickets for sporting events occurring during the freeze." If these regulations are correct in their interpretation of the effects of the freeze, then ticket prices for all sporting events occurring during Phase I of the freeze would be restricted to the highest level set by a substantial volume of transactions during the base period prior to August 14; and since the term "transaction" is thereby deemed to embrace the actual performance of the event rather than the mere sale of tickets, the effect would be to freeze ticket prices at the level of the tickets sold for events actually occurring during the base period, namely, the two exhibition games.

■ The Raiders have argued against this interpretation of the freeze provisions on several grounds, including: (1) that the OEP has misinterpreted the phrase "actual transactions," which should be read to include only the ticket sale itself and not the performance of the actual sporting event; (2) that the OEP is arbitrary in its treatment of sporting events, since it has refused to roll back tuition increases by educational institutions in situations where payment was made before the freeze for delivery of services during the freeze period; and (3) that the entire framework of delegated authority established by the Economic Stabilization Act and Executive Order 11615 is unconstitutionally broad.

As the Raiders recognize, all three of these arguments have already been carefully considered and rejected by other courts. In University of Southern California (USC) v. Cost of Living Council, 472 F.2d 1065 (Em.App.1972), cert. denied 410 U.S. 928, 93 S.Ct. 1364, 35 L. Ed.2d 590 (1973), the Temporary Emergency Court of Appeals upheld the OEP's interpretation of "actual transaction" as applied to advance sales of tickets for sporting events and rejected the suggested analogy to tuition increases on the basis of the "particularly singular nature of education as a whole." 472 F.2d at 1071–1072. The court also rejected attacks on the constitutionality of the wage-price controls with an approving citation to Amalgamated Meat Cutters v. Connally, 337 F.Supp. 737 (D.D.C.1971), in which a three-judge court carefully examined all aspects of

the delegation of authority under the Economic Stabilization Act and upheld the Act's constitutionality. After disposing of these contentions the court held that advance sale tickets for football games were in fact subject to the freeze and remanded the case to the District Court with indications that the refund sought by the OEP should be granted.

■ The Raiders seek to distinguish their own situation from the facts in USC v. Cost of Living Council, *supra,* on the grounds that the Raiders' tickets were sold as part of a season ticket package rather than as individual game tickets; thus, they argue, it is improper to assign a higher price to the regular season tickets in the season ticket package than the price assigned to the exhibition game tickets in the same package. If this reasoning is followed and the price of the season ticket package is prorated evenly over all the home games for the 1971 season, regardless of whether they were exhibition games or regular season games, then it is evident that there was no price *increase* from the exhibition tickets to the regular season tickets. However, as defendants have pointed out, each ticket in the season ticket package has a price printed on it equal to the price which would have been charged for that ticket if purchased individually at the gate prior to the game; moreover, the stipulation of facts entered into by counsel for the Raiders concedes that the total price of the season ticket package equals the sum of the prices of each individual ticket in the package.

It is therefore clear, and this court so finds, that Raider ticket purchasers paid $.50 per ticket more for regular season games than for exhibition games. For the reasons stated above, this increased ticket price for the three home games played in October 1971 violated the terms of the wage-price freeze.

■ The remedy sought by OEP on its counterclaim takes the form of a refund to identifiable ticket purchasers and a reduction in ticket prices for the next season until the remainder of the illegal overcharges has been dissipated. Under the initial version of the Economic Stabilization Act of 1970, the sole remedies available to the government were a $5000.00 fine and injunctive relief, including mandatory injunctions. P.L. 91–379, §§ 204, 205. It was not until the amendments of December 22, 1971, that express authority was given to the courts to order restitution of overcharges as part of the relief available. P.L. 92–210, § 209. Nevertheless, in the *USC* case, *supra,* the Temporary Emergency Court of Appeals held that even under the Act as it existed prior to the amendments, "the power to issue mandatory injunctions includes the power to order restitution or refund of funds held in violation of the regulations and rulings of the CLC and the OEP." 472 F.2d at 1070. Thus there can be no question of this court's power to grant the relief sought by the OEP herein.

On the basis of the entire record, including the arguments submitted on behalf of all parties, this court finds that there is no genuine issue as to any material fact and that the defendants are entitled to judgment as a matter of law. Accordingly,

It is hereby ordered and adjudged:

1. That the defendants' motion be granted, and that this summary judgment in their favor and against the plaintiff be entered accordingly; and

2. That as part hereof, the plaintiff shall forthwith make restitution by refunding all unlawful overcharges (as identified above) to the affected ticket purchasers; and, where such ticket purchasers are not identifiable, plaintiff shall disgorge its unlawful gains by reducing ticket prices for box office sales at home games during the next regular season by the amount of the illegal increase, i. e., $.50, until the total amount of reimbursements due unidentifiable ticket purchasers is exhausted.