**BONRAY OIL COMPANY, an Oklahoma Corporation, Plaintiff,**

v.

**DEPARTMENT OF ENERGY OF the UNITED STATES of America and United States of America, Defendants.**

**No. CIV–77–1078–E.**

United States District Court,
W. D. Oklahoma.

Oct. 12, 1978.

Charles Nesbitt, Oklahoma City, Okl., for plaintiff.

Larry D. Patton, U. S. Atty., and Susie Pritchett, Asst. U. S. Atty., Oklahoma City, Okl. and Barbara Allen Babcock, Asst. Atty. Gen., Civil Div., Dennis G. Linder and Hiram Eastland, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION AND ORDER

EUBANKS, District Judge.

The plaintiff commenced this action under 15 U.S.C. § 754(a)(1) of the Emergency Petroleum Allocation Act of 1973 ("EPAA") against defendant Department of Energy ("DOE") for declaratory and injunctive relief to set aside a Remedial Order and Appeal Decision and Order issued by the Federal Energy Administration ("FEA") to plaintiff Bonray Oil Company ("Bonray"). The FEA was a predecessor of the DOE, which succeeded to the FEA's interests pursuant to the Department of Energy Organization Act. The Order at issue found that plaintiff Bonray sold crude oil produced from the Atherton, Thomas, Johnson-Shepard, and Dougherty-State leases as "stripper well oil" in violation of 10 C.F.R. § 212.173 since these properties, according to the FEA findings, did not qualify as stripper well properties. The FEA Order required plaintiff to refund all overcharges plus interest to the respective purchasers. Plaintiff Bonray alleges that the FEA Order was in excess of statutory authority in that the FEA allegedly possesses no authority to order refunds of overcharges or that interest be paid on such refunds. Bonray further alleges that the FEA exceeded its statutory authority by finding that the stripper well exemption from price control extended only to wells producing "less than ten barrels per day during the preceding calendar year," with the FEA defining "calendar year" as the next preceding period of January 1 through December 31. Bonray alleges that "preceding calendar year" is measured by a period of twelve consecutive months immediately prior to a particular sale, with the twelve consecutive months not necessarily being January 1 to December 31. The plaintiff's complaint also asserts that the FEA's administrative Order is unsupported by substantial evidence. Defendants DOE and United States of America and plaintiff Bonray have filed motions for summary judgment. These motions are presently before the court for disposition.

It should be useful to begin by reviewing briefly the statutes and regulations under which the FEA issued its Remedial Order. There is a series of statutes and regulations which authorize the regulation of pricing and allocation of petroleum, beginning with the Economic Stabilization Act of 1970 ("ESA"), 12 U.S.C. § 1904 note, which es-

tablished the Cost of Living Council ("CLC"). In 1973 Congress passed the Emergency Petroleum Allocation Act ("EPAA"), which required the President to promulgate regulations within 15 days after enactment in order to provide for the mandatory allocation of crude oil, residual fuel oil, and refined petroleum products in amounts and at prices specified in such regulations. These regulations were to take effect not later than 15 days after their promulgation. The EPAA was originally due to expire on February 28, 1975, but has been extended by Congress four times, most recently on December 22, 1975, by the enactment of the Energy Policy and Conservation Act, 15 U.S.C. § 751 note. Pursuant to the ESA and the EPAA, the so-called "two-tier" pricing system for domestic crude oil was established. See 38 Fed.Reg. 19464, 19467.

"Stripper wells," i. e., wells that produce an average of less than ten barrels of crude oil and natural gas liquids per day, were originally subject to the mandatory price controls, but were exempted by Section 406 of the Trans-Alaska Pipeline Authorization Act of 1973 ("TAPAA"), 43 U.S.C. § 1651 et seq. Stripper wells are of marginal economic value, with production at or near the break-even point. The purpose of the exemption was to insure that the price ceilings did not function as a disincentive to this form of domestic petroleum production. TAPAA § 406 exempted from price and allocation regulations "the first sale of crude oil and natural gas liquids produced from any lease whose average daily production of such substances for the preceding calendar month does not exceed ten barrels per well." This provision was superseded by 15 U.S.C. § 753(e)(2)(A) of the EPAA, which continued the stripper well exemption but modified it to exempt only "any lease whose average daily production of crude oil for the preceding calendar year does not exceed 10 barrels per well."

In accordance with the statutory exemption, FEA excepted the first sale of crude oil produced by a stripper well lease from FEA's Mandatory Petroleum Allocation and Price Regulations. FEA's definition of a stripper well lease was:

"Stripper well lease" means a property whose average daily production of crude petroleum and petroleum condensates, including natural gas liquids, per well did not exceed 10 barrels per day during the preceding calendar year.

10 C.F.R. § 210.32(b); 39 Fed.Reg. 6531 (Feb. 20, 1974).

During early 1975, the FEA determined that the stripper well lease definition in 10 C.F.R. § 210.32(b) discouraged increased production from marginally producing wells because the regulation afforded an exemption from price controls only in the year following a calendar year in which production from the lease was at or below the statutory stripper well limit of ten barrels or less per well per day. Thus, there was no incentive for producers to increase production levels above that limit either through work-overs or enhanced recovery techniques since an increased per-well production for a calendar year would then result in a loss of the stripper well exemption in the following year. Accordingly, FEA adopted an amendment to 10 C.F.R. § 210.-32(b) which redefined the stripper well lease as "a property whose average daily production of crude oil, including condensates, per well did not exceed 10 barrels per day during any preceding calendar year beginning after December 31, 1972." 40 Fed. Reg. 22123 (May 21, 1975). The sales at issue in the FEA Remedial Order to Bonray took place in the period September 1973 to December 1975, when the regulations discussed above were in effect. Both the original language of 10 C.F.R. § 210.32(b) and the amendment of 1975 use the language "preceding calendar year" as the time when average daily production per well should have been ten barrels or less in order for the well to qualify as a stripper well.

Following the sales at issue in the Remedial Order, the stripper well exemption was repealed by Section 401(b) of the Energy Policy and Conservation Act of 1975, P.L. 94–163, and reinstated by the Energy Conservation and Production Act, P.L. 94–385,

15 U.S.C. § 757(i). The present definition of a stripper well property under FEA regulations provides that "condensate recovered in non-associated production" is excluded from the ten-barrel average, and the average may be calculated in "any consecutive 12-month period beginning after December 31, 1972." 10 C.F.R. § 212.54(c); 41 Fed.Reg. 48323 (Nov. 3, 1976).

Section 754(a)(1) of the Emergency Petroleum Allocation Act incorporates the judicial review provision in Section 211 of the Economic Stabilization Act of 1970, as amended. Pursuant to Section 211(d)(1), the scope of this court's review of the Remedial Order is as follows:

> . . . [N]o order of such agency shall be enjoined or set aside, in whole or in part, unless a final judgment determines that such order is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence.

The "substantial evidence" test is a test for judicial review of findings of fact made by an administrative agency. In its complaint in this action, Bonray alleged that the FEA's administrative Remedial Order was unsupported by substantial evidence. However, in its brief in support of its motion for summary judgment, Bonray does not attack as a matter of law any FEA finding within the Remedial Order as being unsupported by substantial evidence. Since Bonray apparently does not wish to assert this ground for judicial review, the court need not examine whether or not the FEA findings were supported by substantial evidence.

Bonray alleges that the only remaining issues in this action are issues of law involving whether the FEA's Remedial Order was in excess of the agency's authority. Bonray has asserted that the FEA Order was in excess of the agency's authority in two ways: (1) that the FEA lacked lawful authority to issue a Remedial Order requiring refund of alleged overcharges plus interest on the overcharges; and (2) that the FEA exceeded its authority in its definition of the term "calendar year" as used in the stripper well exemption.

The court will begin by considering Bonray's second contention, that the FEA exceeded its authority in its definition of the term "calendar year." It appears to the court that the literal meaning of the term "calendar year" is the period of twelve months between January 1 and December 31. Bonray asserts, however, that the intent of Congress must be considered in defining the term "calendar year." As the defendant points out in its brief, when the stripper well exemption was first originated in the Trans-Alaska Pipeline Act, the Conference Report concerning that exemption indicated that it was the congressional intent for the exemption to be "narrowly defined and prudently administered." Plaintiff Bonray does not point out any language in the legislative history of the stripper well exemption which indicates that the term "calendar year" should have a meaning different from its literal, commonly understood meaning. The court finds, therefore, that the FEA's interpretation of "calendar year" as a twelve-month period beginning January 1 and ending December 31 is literally correct and is consistent with congressional intent. Accordingly, the FEA did not exceed its authority in so construing the term.

■ Bonray does not challenge the FEA's finding that the Atherton, Thomas, Johnson-Shepard, and Dougherty-State leases would not have qualified as stripper well properties in 1973 through 1975 if the definition of "calendar year" in the stripper well exemption was the twelve-month period between January 1 and December 31. Bonray asserts, and defendant DOE does not deny, that prior to the sales found by the FEA Remedial Order to include overcharges, there was a period of twelve consecutive months on each lease where average daily production of oil was not more than ten barrels. Thus, Bonray's contention was that if FEA had, as a matter of law, exceeded its authority in its definition of "calendar year," then the leases cited in the Remedial Order would actually be qualified stripper well properties. However, since it is the finding of the court that the FEA did not exceed its authority in its definition of "calendar year," then the find-

ing by the FEA that the above-mentioned leases were not qualified properties under the stripper well exemption must stand.

The court must now consider Bonray's other contention, that the FEA lacked lawful authority to issue a Remedial Order requiring refund of overcharges plus interest on the overcharges. Bonray argues that only courts have authority to award refunds and that the authority for court-ordered refunds is contained in Sections 209 and 210 of the Economic Stabilization Act, 12 U.S.C.A. § 1904 note. The Emergency Petroleum Allocation Act incorporated these enforcement provisions. 15 U.S.C. § 754(a).

The ESA enforcement provisions provide different methods of enforcing price control regulations and orders. Section 209 grants the President authority through the Attorney General to seek enforcement of regulations and orders promulgated under the ESA. Section 210 provides that a private party injured by an overcharge or other violation of an order or regulation issued pursuant to the ESA may bring an action for a refund or other relief, including treble damages and attorney fees.

Bonray argues that under the statutory provisions of the ESA, an action by a private party under § 210 is the exclusive means of achieving a refund of overcharges. It appears to this court, however, that § 210 is not exclusive but rather must be considered along with § 209. Section 209 states that in addition to granting injunctive enforcement of regulations and orders issued pursuant to the ESA, "the court may also order restitution of moneys received in violation of any such order or regulation." Thus, it appears to the court that the ESA contemplated refund of overcharges even in situations where the private parties did not seek the remedies provided in § 210.

Bonray alleges, however, that the FEA did not have the statutory authority to order refund of overcharges and that the refund of overcharges spoken of in § 209 would be entirely a matter of judicial discretion after injunctive relief enjoining a party from violating an agency regulation or order had been found to be proper. In other words, Bonray alleges that the FEA did not have the authority to order refunds but rather merely to order compliance with its regulations and orders. The refund of overcharges, according to Bonray, would be entirely up to the court after the court had determined that an injunction was proper.

The court does not find anything in § 209 of the ESA, however, which forbids an agency from ordering a refund of overcharges. Section 209 provides for judicial enforcement of an agency order if a party does not voluntarily comply with the order. Section 209 also provides for judicial imposition of an order to refund overcharges. Nothing in § 209, however, indicates that the agency charged with carrying out the provisions of the ESA could not order refund of overcharges. Since an agency order to refund overcharges is neither specifically authorized nor forbidden in the ESA and the EPAA, the court must look beyond the statutes to determine whether the FEA acted within its authority in issuing a Remedial Order compelling refund of overcharges.

Prior to passage of the EPAA, the Cost of Living Council had responsibility for the development and implementation of a program designed to carry out provisions of the ESA, which gave the President authority to "issue such orders and regulations as he deems appropriate" to "stabilize prices, rents, wages, and salaries." See ESA § 203(a)(1). The CLC's Phase IV Price Procedures contained provisions for the issuance by the CLC of Remedial Orders, defined as "order[s] requiring a person to cease a violation or to take action to eliminate or to compensate for the effect of a violation, or both, or which imposes other sanctions." 6 C.F.R. § 155.81(b); 39 Fed. Reg. 21981 (Aug. 15, 1973).

When Congress enacted the EPAA, the judicial review and enforcement provisions of the ESA which had been applicable to the CLC during the Economic Stabilization Program were incorporated into § 754(a)(1). Thereafter, the FEA's regulatory authority under the EPAA was extended by Congress four times. Throughout this period, provisions in FEA regulations provided that FEA could issue remedial orders to violators of the pricing and allocation regulations

requiring them to refund overcharges, with interest. See 10 C.F.R. § 205.195. Furthermore, as the defendant points out in its brief, statements included in the Congressional report on the EPAA indicated that Congress was familiar with the CLC's Phase IV Petroleum Price Regulations and intended that they form the basis for the price regulations to be adopted under the EPAA. H.Rep. No. 93–628, 93d Cong., 2d Sess. 26 (1973).

The fact that Congress re-enacted FEA's statutory authority several times while the FEA was ordering refunds of violations can be interpreted as congressional approval of the FEA's interpretation of its statutory powers. *Mobil Oil Corp. v. FEA*, 566 F.2d 87, 100 (T.E.C.A.1977). The Supreme Court stated in *Commissioner v. Noel's Estate*, 380 U.S. 678, 682, 85 S.Ct. 1238, 1240, 14 L.Ed.2d 159, 162 (1965) that "a long-standing administrative interpretation, applying to a substantially re-enacted statute, is deemed to have received congressional approval and has the effect of law."

"The width of administrative authority must be measured in part by the purposes for which it was conferred." *Permiam Basin Rate Cases*, 390 U.S. 747, 776, 88 S.Ct. 1344, 1364, 20 L.Ed.2d 312, 19 L.Ed.2d 359 (1968). TECA repeatedly measured the breadth of FEA's (and CLC's) powers by the broad purposes of the Congressional mandate in both the ESA and the EPAA. Thus, in *University of Southern California v. Cost of Living Council*, 472 F.2d 1065, the CLC, in furtherance of its mandate to stabilize prices, had ordered the plaintiff to refund overcharges on football tickets. TECA found the refund order to be a reasonable exercise of the CLC's power:

> Once again we must repeat that we are faced with the broadest of delegations of authority, delegation that carried with it the power to "take such . . . actions as [the CLC] determines to be necessary and appropriate to carry out the purposes of the Order." That such a broad grant of power contains within it the authority to require refunds in situations such as this in order to give maximum effect to the wage-price freeze seems totally reasonable. While this

court recognizes the considerable burden that such a refund demand places upon USC, we recognize also the right of the agencies to require it. Faced with what we believe to be no clear showing that the Order denies such a power, and faced with the broad grant of authority to the agencies under which such a power can readily be implied, we find the power to demand such a refund properly at the appellants' disposal.

472 F.2d at 1070 (footnotes omitted).

One of the statutory goals of the EPAA is set out in § 753(b)(1) as follows:

> (F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users . . .

Requiring refunds of overcharges is certainly a rational method of accomplishing this goal.

■ The court cannot find any statutory authority denying the FEA the authority to issue Remedial Orders compelling the refund of overcharges. On the contrary, the court finds that there is much support for the position that the ordering of refunds is an implied power of the FEA under the EPAA. The court finds, therefore, that the FEA did not exceed its statutory authority in ordering refunds on overcharges in the Remedial Order presently challenged by plaintiff Bonray.

Bonray contends finally, however, that even if ordering refunds on overcharges was within the FEA's statutory authority, ordering interest on the overcharges was not. The court finds that the requirement that sellers who violate regulations and orders promulgated under the EPAA also pay interest on the amount of the overcharge is a rational method to "make whole" those who have been overcharged. In general, where agencies, in the exercise of their remedial authority, have ordered the payment of interest on a sum due an aggrieved party, courts have upheld the orders against

similar contentions that an order to pay interest is in excess of statutory authority. See *Reserve Supply Corp. v. NLRB,* 317 F.2d 785 (2nd Cir. 1963).

Thus, in accordance with the reasons discussed above, the court finds that the FEA acted within its statutory authority both in its definition of "calendar year" and in its order that plaintiff Bonray refund overcharges plus interest to purchasers. By reason of the foregoing, the motion for summary judgment filed herein on behalf of defendants Department of Energy and the United States of America is granted; the same motion filed on behalf of plaintiff is denied. The effective date of this order will be that when judgment is entered and not the date of this order. Counsel for defendants will promptly prepare and circulate for approval formal judgment.