95 F.3d 1555
 PHOENIX PETROLEUM COMPANY, Plaintiff-Appellant,
v.
UNITED STATES FEDERAL ENERGY REGULATORY COMMISSION,
Department of Energy, Hazel O'Leary, Secretary of
Energy and The United States,
Defendants-Appellees.
PETRADE INTERNATIONAL, INC., Plaintiff-Appellant,
v.
UNITED STATES FEDERAL ENERGY REGULATORY COMMISSION,
Department of Energy, Hazel O'Leary, Secretary of
Energy, and the United States,
Defendants-Appellees.
 Nos. 95-1279, 95-1282.
 United States Court of Appeals,
Federal Circuit.
 Sept. 10, 1996.
 Rehearing Denied; Suggestion for Rehearing In Banc Declined
Nov. 21, 1996.
 
 Bruce R. Coulombe, Andrews & Kurth L.L.P., Houston, Texas, argued for plaintiffs-appellants.
 Don W. Crockett, Office of General Counsel, U.S. Department of Energy, Washington, D.C., argued for defendants-appellees.
 Before NEWMAN, MICHEL, and SCHALL, Circuit Judges.
 SCHALL, Circuit Judge.
 
 
 1
 These appeals arise from remedial orders ("ROs") issued by the Federal Energy Regulatory Commission ("FERC") and affirmed by the United States District Court for the Southern District of Texas. On November 5, 1986, the Department of Energy ("DOE") issued a RO finding that Petrade International, Inc. ("Petrade") had violated certain crude oil resale regulations and ordering restitution of overcharges. Petrade Int'l, Inc., 15 DOE (CCH) p 83,005 (1986).[1] FERC affirmed the DOE RO, Petrade Int'l, Inc., 62 FERC (CCH) p 61,021 (1993), and Petrade appealed to the district court. On March 28, 1995, the district court granted DOE's motion for summary judgment, affirmed FERC's RO, and entered judgment requiring Petrade to disgorge as restitution $3,238,284.99, plus interest. Petrade Int'l, Inc. v. FERC, No. H-93-758 (S.D.Tex. Mar. 28, 1995).
 
 
 2
 On September 29, 1988, DOE issued a RO finding that Phoenix Petroleum Co. ("Phoenix") had violated certain crude oil resale regulations and ordering restitution of overcharges. Phoenix Petroleum Co., 17 DOE (CCH) p 83,019 (1988), modified, 18 DOE (CCH) p 83,009 (1989).[2] FERC affirmed the RO as modified, Phoenix Petroleum Co., 65 FERC (CCH) p 61,174 (1993), and Phoenix appealed to the district court. On March 24, 1995, the district court granted DOE's motion for summary judgment, affirmed the FERC's RO, and entered judgment requiring Phoenix to disgorge as restitution $27,943,474.27, plus interest. Phoenix Petroleum Co. v. FERC, No. H-93-4145 (S.D.Tex. Mar. 24, 1995).
 
 
 3
 On March 31, 1995, Petrade and Phoenix (collectively "the companies") appealed concurrently to the Courts of Appeals for the Federal Circuit and the Fifth Circuit. DOE moved to dismiss the consolidated Fifth Circuit appeal on the ground that this court has exclusive appellate jurisdiction in the matter. On May 19, 1995, the Fifth Circuit issued an unpublished order granting, without discussion, DOE's motion to dismiss. Petrade Int'l, Inc. v. FERC, Nos. 95-20242, 95-20243 (5th Cir. May 19, 1995). The companies then filed a motion with this court to transfer the consolidated appeal to the Fifth Circuit; DOE opposed. The motion to transfer was denied in a single-judge order with a threshold determination being made that the court has jurisdiction to hear the appeal. The order left the ultimate jurisdictional determination to the merits panel assigned to the case. Phoenix Petroleum Co. v. FERC, Nos. 95-1279, 95-1282, (Fed.Cir. July 26, 1995). For the reasons set forth below, we (i) hold that we have jurisdiction and (ii) affirm the decisions of the district court affirming FERC's ROs.
 
 BACKGROUND
 I. Introduction
 
 4
 FERC determined that Petrade had violated 10 C.F.R. § 212.186 (the "layering regulation") and 10 C.F.R. § 212.183 (the "permissible average markup regulation" or the "PAM regulation"), Petrade, 62 FERC at 61,166-67, and that Phoenix had violated the layering regulation. Phoenix, 65 FERC at 61,873, 61,878. These regulations are part of a body of law, which originated in the 1970's and was in effect until September, 1981, to control the allocation and price of crude oil. This law was enforced by DOE and its predecessors, the Cost of Living Council ("CLC"), the Federal Energy Office ("FEO"), and the Federal Energy Administration ("FEA"). Appeals arising under this law were within the jurisdiction of the Temporary Emergency Court of Appeals ("TECA").
 
 
 5
 Effective April 29, 1993, however, TECA was abolished, and all remaining actions within its jurisdiction were transferred to this court. Federal Courts Administration Act of 1992 ("FCAA"), Pub.L. No. 102-572, § 102, 106 Stat. 4506, 4506-07 (1992); Texas American Oil Corp. v. Department of Energy, 44 F.3d 1557, 1561 (Fed.Cir.1995) (in banc). At the same time, the jurisdiction of the Federal Circuit was expanded to add appeals arising under the Economic Stabilization Act of 1970 ("ESA") and the Emergency Petroleum Allocation Act of 1973 ("EPAA"), two of the statutes at issue in this case. FCAA § 102(c), 106 Stat. at 4507; see 28 U.S.C. § 1295(a)(11)-(12) (1994). In Texas American, this court, sitting in banc, adopted as precedent the body of law represented by the holdings of TECA. 44 F.3d at 1561. Because Phoenix and Petrade challenge our jurisdiction in this case, and because the issues raised in this case are novel to this court, it is appropriate that we review the history of the ESA and the EPAA, TECA, and the administrative bodies responsible for enforcing the ESA and the EPAA.[3]
 
 
 6
 II. The Statutory and Administrative Framework
 
 
 7
 Enacted on August 15, 1970, the ESA authorized the President to "issue such orders and regulations as he may deem appropriate" to "stabilize prices, rents, wages, and salaries." Pub.L. No. 91-379, § 202, 84 Stat. 799, 799-800 (1970) (codified as amended at 12 U.S.C. §§ 1901-1910 note (1994)). On August 15, 1971, President Nixon exercised his authority under the ESA. In so doing, he imposed wage and price controls, and established the CLC, to which he delegated "all of the powers conferred on the President by the [ESA]." Exec. Order No. 11,615, 3 C.F.R. 602, 603 (1971-1975); See University of S. Cal. v. Cost of Living Council, 472 F.2d 1065, 1066-67 (Temp.Emer.Ct.App.1972), cert. denied, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973).
 
 
 8
 On December 22, 1971, the ESA was extended and amended by the Economic Stabilization Act Amendments of 1971. Pub.L. No. 92-210, 85 Stat. 743 (1971). The 1971 ESA amendments added a judicial review provision, ESA section 211. 85 Stat. at 748-50. The provision placed trial jurisdiction in the federal district courts, ESA § 211(a), and created TECA, ESA § 211(b)(1). ESA section 211 assigned TECA exclusive appellate jurisdiction in "cases and controversies arising under" the ESA, ESA § 211(b)(2), in order "to funnel into one court all the appeals arising out of the District Courts and thus gain in consistency of decision." S.Rep. No. 92-507, 92nd Cong., 1st Sess. 10, reprinted in 1971 U.S.C.C.A.N. 2283, 2292; Texas American, 44 F.3d at 1562.
 
 
 9
 In 1973, the President's ESA authority was augmented by adding ESA section 203(a)(3) to allow "in his judgment ... the establishment of priorities of use and ... allocation of supplies of petroleum products including crude oil" and was extended through April 30, 1974. Economic Stabilization Act Amendments of 1973, Pub.L. No. 93-28, 87 Stat. 27 (1973).
 
 
 10
 The ESA was not further extended, but portions of it were incorporated by reference in the EPAA, Pub.L. No. 93-159, 87 Stat. 627 (1973) (codified as amended, but omitted, at 15 U.S.C. §§ 751 et seq. (1994)). Enacted on November 27, 1973, the EPAA required the President, not later than 15 days after enactment, to promulgate regulations providing for the mandatory allocation of crude oil and other petroleum products in amounts and at prices specified in such regulations. EPAA § 4(a), 87 Stat. at 629; Bonray Oil Co. v. Department of Energy, 472 F.Supp. 899, 900-01 (W.D.Okla.1978), aff'd, 601 F.2d 1191 (Temp.Emer.Ct.App.1979). Sections 205 through 213 (other than section 212(b)) of the ESA were made applicable to action taken under the EPAA by section 5(a)(1) of the EPAA. EPAA § 5, 87 Stat. at 633; Texas American, 44 F.3d at 1562; Atlantic Richfield Co. v. Department of Energy, 769 F.2d 771, 775 n. 10 (D.C.Cir.1984). The ESA's judicial review provision, section 211, thus was incorporated into the EPAA and applies to actions undertaken pursuant to the EPAA. Section 5(a)(1) of the EPAA stated in pertinent part as follows:
 
 
 11
 [Section] ... 211 of the [ESA] (as in effect on the date of enactment of this Act) shall apply to the regulation promulgated under section 4(a), to any order under this Act, and to any action taken by the President (or his delegate) under this Act, as if such regulation had been promulgated, such order had been issued, or such action had been taken under the [ESA]....
 
 
 12
 87 Stat. at 633. In sum, while the ESA had expired, specific ESA provisions remained in effect because they were incorporated into the EPAA.[4]
 
 
 13
 Pursuant to the EPAA/ESA, on December 4, 1973, President Nixon issued Executive Order 11748, which established the FEO in the Executive Office of the President. Exec. Order No. 11,748, 3 C.F.R. 822 (1971-1975). The President delegated to the FEO all authority vested in him by the EPAA and by ESA § 203(a)(3) (authority to allocate petroleum products). Id. He also ordered the CLC to delegate to the FEO its ESA authority with respect to energy matters. Id. This shift in ESA enforcement authority from the CLC to the FEO was the first of three major shifts of EPAA/ESA enforcement authority.
 
 
 14
 The Federal Energy Administration Act of 1974 ("FEA Act") created the FEA and transferred to it, inter alia, the energy functions of the CLC (as noted above, previously delegated to the FEO). Pub.L. No. 93-275, 88 Stat. 96 (1974) (codified as amended at 15 U.S.C. §§ 761 et seq. (1994)). Pursuant to the FEA Act, on June 25, 1974, President Nixon abolished the FEO, transferred all authority exercised by the FEO to the FEA, and delegated all of the President's EPAA/ESA authority to the FEA. Exec. Order No. 11,790, 3 C.F.R. 882 (1971-1975); Cities Serv. Co. v. Federal Energy Admin., 529 F.2d 1016, 1020 n. 5 (Temp.Emer.Ct.App.1975), cert. denied, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976); Air Transport Ass'n of Am. v. Federal Energy Office, 520 F.2d 1339, 1340 n. 1 (Temp.Emer.Ct.App.1975). The FEA Act contained a judicial review provision which applied to all administrative rulemaking undertaken pursuant to the FEA Act; the provision specifically excepted, however, any administrative rulemaking undertaken pursuant to the EPAA/ESA. FEA Act § 7(i)(2)(A), 88 Stat. at 102 (currently codified at 15 U.S.C. § 766(c)). In its entirety, the judicial review provision stated as follows:
 
 
 15
 Judicial review of administrative rulemaking of general and national applicability done under this [Act], except that done pursuant to the Emergency Petroleum Allocation Act of 1973, may be obtained only by filing a petition for review in the United States Court of Appeals for the District of Columbia within thirty days from the date of promulgation of any such rule, regulation, or order, and judicial review of administrative rulemaking of general, but less than national, applicability done under this [Act], except that done pursuant to the Emergency Petroleum Allocation Act of 1973, may be obtained only by filing a petition for review in the United States Court of Appeals for the appropriate circuit within thirty days from the date of promulgation of any such rule, regulation, or order, the appropriate circuit being defined as the circuit which contains the area or the greater part of the area within which the rule, regulation, or order is to have effect.
 
 
 16
 15 U.S.C. § 766(c).
 
 
 17
 In 1977, the FEA was succeeded by DOE. Enacted in August, 1977, the Department of Energy Organization Act ("DOE Act") established DOE and FERC. Pub.L. No. 95-91, 91 Stat. 565 (1977) (codified at 42 U.S.C. §§ 7101 et seq. (1994)). The DOE Act provided that all functions vested by law in the FEA were to be transferred to and vested in the Secretary of DOE. 42 U.S.C. § 7151. The DOE Act terminated the FEA after all of its functions were transferred. 42 U.S.C. § 7293. Pursuant to the DOE Act, on October 1, 1977, all FEA functions were transferred to DOE. MAPCO Int'l, Inc. v. FERC, 783 F.Supp. 639, 641 n. 3 (D.D.C.1992), aff'd, 993 F.2d 235 (Temp.Emer.Ct.App.1993); see 42 U.S.C. § 7341; Exec. Order No. 12,009, 3 C.F.R. 142 (1978). On February 3, 1978, President Carter amended Executive Order No. 11790, which had delegated the President's EPAA/ESA authority to the FEA, to delegate that authority to the Secretary of DOE. Exec. Order No. 12,038, 3 C.F.R. 136 (1979).
 
 
 18
 As did the ESA, the EPAA, and the FEA Act, the DOE Act contains a judicial review provision. As stated above, ESA section 211 created TECA to review cases and controversies arising under the ESA, and the EPAA incorporated, inter alia, ESA section 211 as its judicial review provision. While the FEA Act provided for judicial review of FEA administrative actions, it explicitly excepted any EPAA/ESA administrative action from the FEA judicial review provision. 15 U.S.C. § 766(c). The DOE Act judicial review provision differentiates between judicial review of DOE agency action arising under laws that contain specific judicial review provisions and DOE agency action arising under the DOE Act. DOE Act section 502(a) addresses the first category of agency action, and states in pertinent part as follows:
 
 
 19
 Judicial review of agency action taken under any law the functions of which are vested by law in, or transferred or delegated to the Secretary, [or] the [Federal Energy Regulatory] Commission ... shall, notwithstanding such vesting, transfer, or delegation, be made in the manner specified in or for such law.
 
 
 20
 42 U.S.C. § 7192(a). Thus, pursuant to the DOE Act, DOE agency actions undertaken under the EPAA/ESA are subject to judicial review in accordance with the judicial review provision of the EPAA/ESA--section 211 of the ESA.
 
 
 21
 DOE Act section 502(b) addresses the second category of agency action, and states in pertinent part as follows:
 
 
 22
 Notwithstanding the amount in controversy, the district courts of the United States shall have exclusive original jurisdiction of all other cases or controversies arising exclusively under this chapter, or under rules, regulations, or orders issued exclusively thereunder....
 
 
 23
 42 U.S.C. § 7192(b) (emphasis added). DOE Act section 502(b) did not restrict appeals from the district courts. Nor did it specify any special provision for appeals to TECA. Texaco Inc. v. Department of Energy, 616 F.2d 1193, 1196 (Temp.Emer.Ct.App.1979).
 
 
 24
 While section 502(a) of the DOE Act, 42 U.S.C. § 7192(a), covers, but does not expressly address, EPAA/ESA actions, the next immediate provision, section 503, 42 U.S.C. § 7193, does. Section 503(a) prescribes how DOE may issue a RO to a person believed to have violated any regulation, rule, or order promulgated pursuant to the EPAA. 42 U.S.C. § 7193(a). Section 503(c) governs how FERC reviews ROs issued by DOE and prescribes that
 
 
 25
 [t]he Commission shall thereafter issue an order, based on findings of fact, affirming, modifying, or vacating the [DOE] remedial order, or directing other appropriate relief, and such order shall, for the purpose of judicial review, constitute a final agency action, except that enforcement and other judicial review of such action shall be the responsibility of [DOE].
 
 
 26
 42 U.S.C. § 7193(c). 42 U.S.C. § 7193 does not further address judicial review of EPAA administrative action.
 
 
 27
 As noted above, on April 29, 1993, jurisdiction over EPAA/ESA appeals was transferred from TECA to this court. In effecting that transfer, the FCAA amended the ESA. FCAA section 102(a) struck ESA section 211, subsections (b) through (h), and substituted as subsection (b) the following:
 
 
 28
 (b) Appeals from orders or judgments entered by a district court of the United States in cases and controversies arising under this title shall be brought in the United States Court of Appeals for the Federal Circuit if the appeal is from a final decision of the district court or is an interlocutory appeal permitted under section 1292(c) of title 28, United States Code.
 
 
 29
 FCAA § 102(a), 106 Stat. at 4506. ESA section 211(d)(1), struck by FCAA section 102(a), established the TECA standard of review with respect to EPAA/ESA agency actions:
 
 
 30
 [N]o order of such agency [exercising authority under the ESA] shall be enjoined or set aside, in whole or in part, unless a final judgment determines that such order is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence.
 
 
 31
 ESA § 211(d)(1), 85 Stat. at 749; see MAPCO, 993 F.2d at 239; Pratt v. Watkins, 946 F.2d 907, 909 (Temp.Emer.Ct.App.1991).
 
 
 32
 Thus, under the existing statutory scheme, a person wishing to appeal a FERC decision arising from DOE administrative action undertaken pursuant to the EPAA/ESA proceeds first in the appropriate United States District Court. Any subsequent appeal is to this court. However, as a result of the amendment of ESA section 211 by section 102(a) of the FCAA, there is no statutory provision in force that states the standard of review to be applied by the courts when judging DOE's action.
 
 III. TECA's Jurisdiction
 
 33
 In Texas American, this court summarized TECA's holdings as to its jurisdiction under the EPAA/ESA and held that TECA precedent and practice on jurisdictional matters shall apply to cases that reach this court as successor to TECA. 44 F.3d at 1563-64. TECA interpreted its statutory authorization under the ESA as vesting it with a narrow "issue" jurisdiction, as opposed to a broader "case" or "arising under" jurisdiction. Id. at 1563. Under its jurisdictional policy and practice, TECA decided only the EPAA/ESA issues in a case, and left to the regional circuit courts all other discrete issues arising in the same transaction or joined to the EPAA/ESA issues. Id. TECA jurisdiction extended to any issue--if raised in a complaint, or as a defense, or as a counterclaim--requiring interpretation or application of the EPAA, the ESA, or a related regulation. Id. Such an issue was within the exclusive jurisdiction of TECA, and was separate from the appeal of any other substantive issue. Id.
 
 
 34
 The threshold jurisdictional requirements for a TECA appeal were: "(1) resolution of the litigation must have required application or interpretation of the EPAA/ESA or its regulations, and (2) the EPAA/ESA issue must have been adjudicated in the district court." Id.; Pennzoil Exploration & Prod. Co. v. Lujan, 928 F.2d 1139, 1141 (Temp.Emer.Ct.App.1991). If TECA was required to consider and apply laws in interaction with the EPAA/ESA in the course of deciding the issue before the court, it had jurisdiction with respect to such laws. Texas American, 44 F.3d at 1564. Similarly, TECA's exclusive jurisdiction extended to issues that did not themselves arise under the EPAA when "a meaningful ruling requires consideration of the issues as a whole, the construction of the EPAA will control the litigation, the issues are so commingled as to render separate treatment impractical, or the non-EPAA issues are subsidiary, preliminary or threshold to an EPAA issue." Pennzoil, 928 F.2d at 1141 (citations omitted).
 
 DISCUSSION
 
 35
 Phoenix and Petrade contend that we lack jurisdiction and that we should transfer the case to the Fifth Circuit. Alternatively, they argue that we at least lack jurisdiction over certain issues and that we should sever and transfer those issues to the Fifth Circuit. The issues the companies say must be severed are (1) whether, in the proceedings before it, FERC improperly shifted the burden of proof to the companies, and (2) whether FERC erred by failing to consider the companies' arguments that the regulations at issue are invalid. If we have jurisdiction, the companies argue each of these issues presents grounds for setting aside the ROs. In addition, the companies contend that they did not engage in crude oil transactions subject to the EPAA/ESA regulations at issue.
 
 I. Jurisdiction
 A.
 
 36
 The July 1995 order of this court denying the motion to transfer to the Fifth Circuit relied upon Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988). In Christianson, the Supreme Court resolved a difference of opinion between two circuits where each had held that the other had jurisdiction and had transferred the case to the other. 486 U.S. at 803-807, 108 S.Ct. at 2170-2173. The Court held that appellate courts should "adher[e] strictly to principles of law of the case" and that the transferee court's jurisdictional inquiry is at an end if the transferor court's decision was "plausible." 486 U.S. at 819, 108 S.Ct. at 2179. In referring the jurisdictional issue to the merits panel, the single-judge order declined to find that the Fifth Circuit's decision not to exercise jurisdiction was implausible.
 
 
 37
 Preliminarily, the companies argue that Christianson does not apply to this case, because the Fifth Circuit did not transfer the case to us, but, rather, dismissed the concurrent appeal pending before it. The contention is without merit. First, Christianson cannot be avoided by a party filing concurrent appeals in two circuit courts, with either appeal subject to dismissal or being held in abeyance, rather than filing an appeal in one circuit court, with that appeal subject to transfer. Christianson controls. Second, the Fifth Circuit's determination that it has no jurisdiction over the appeal is the law of the case. It may be overturned only upon a holding that it has no plausible basis. Id.; Texas American, 44 F.3d at 1561-62. Thus, unless we deem the Fifth Circuit's dismissal in favor of this court to be without a plausible basis, our jurisdictional inquiry is at an end.
 
 B.
 
 38
 Relying upon two cases, Texaco Inc. v. Department of Energy, 616 F.2d 1193, and Atlantic Richfield Co. v. Department of Energy, 769 F.2d 771, the companies argue that we lack jurisdiction because the ROs were issued pursuant to the Secretary's authority under the DOE Act, rather than under the EPAA/ESA.
 
 
 39
 In Texaco, TECA distinguished between appeals that arose solely under the DOE Act, and those that arose under the EPAA and the DOE Act. As to the first, it held that it was without jurisdiction over an appeal that "involve[d] an interpretation of the DOE Act itself and not an application of any other law, the functions of which have been transferred to the DOE." Texaco, 616 F.2d at 1196. TECA held that it did have jurisdiction over an appeal arising under the EPAA and the DOE Act, however, concluding that "[a]gency action taken under the EPAA is one ... function that has been transferred to the DOE" and "judicial review of such agency action may be had, as provided by the EPAA, in the district court and subsequently in this Court." Id. at 1196.
 
 
 40
 The companies, nevertheless, argue that the D.C. Circuit in Atlantic Richfield distinguished DOE EPAA/ESA enforcement proceedings that arose under the authority of DOE's predecessors from proceedings that arose solely under the authority of DOE. At issue in Atlantic Richfield were alleged violations of price control regulations in two cases: the "Affiliate Transfer Case" and the "Property Case." 769 F.2d at 777. The court held that TECA had exclusive jurisdiction over the Affiliate Transfer Case because it was being prosecuted under EPAA authority previously conferred on the FEA and transferred to DOE by the DOE Act. Id. at 778-80. The court determined that it had jurisdiction over the Property Case, however. In analyzing why it had jurisdiction, the Atlantic Richfield court stated as follows:
 
 
 41
 By contrast, the validity of the Department's action in the Property Case is a question arising exclusively under the [DOE] Act, and thus is beyond TECA's jurisdiction. That case was commenced ... well after the effective date of the [DOE] Act. [The DOE Act] erected an entirely new scheme of enforcement of price-control regulations, entirely independent of the preexisting statutory framework within which the [FEA] functioned under the [ESA] and [EPAA]. The scope of the Secretary's authority under Section 503 of the [DOE] Act is an issue arising solely under the [DOE] Act; it does not involve the construction, application or effect of either ... the [ESA or the EPAA]. We, not TECA, have jurisdiction to consider and decide ... the Property Case.
 
 
 42
 Id. at 780 (footnotes omitted). Pointing to the above statement from Atlantic Richfield, the companies note that the case now on appeal before us was commenced after the effective data of the DOE Act and that the DOE Act "erected an entirely new scheme of price control regulations." From this they argue that TECA jurisdiction did not extend to DOE Act section 503 enforcement actions, i.e. EPAA/ESA remedial orders initiated by DOE, such as those at issue here, because they came after the DOE Act's effective date.
 
 
 43
 Under the companies' interpretation of Atlantic Richfield, the D.C. Circuit's jurisdictional holding would be in conflict with TECA's holding in Texaco. Under Texaco, if the appeal required interpretation of only the DOE Act, TECA had no jurisdiction. 616 F.2d at 1195-96. If DOE Act agency action under the EPAA/ESA was appealed, TECA had jurisdiction. Id. at 1196, 1197 n. 2. If read as the companies urge, Atlantic Richfield would narrow the latter Texaco holding because it would limit TECA jurisdiction to EPAA/ESA actions initiated by DOE's predecessors prior to the effective date of the DOE Act.
 
 
 44
 We reject the companies' argument because it misreads Atlantic Richfield. The first issue in the Property Case was whether DOE Act section 503, 42 U.S.C. § 7193, vested all adjudicatory power over EPAA/ESA remedial orders in FERC, or whether DOE also had adjudicatory powers. Atlantic Richfield, 769 F.2d at 785-92. The second issue was whether DOE, in exercising its remedial order adjudicatory power, could order preclusion of affirmative defenses as a sanction for disobedience of a DOE discovery order. Id. at 792-96. The D.C. Circuit concluded that DOE had authority to adjudicate remedial orders and to impose the sanction at issue. Id. at 792, 797. Significantly, these issues involved only interpretation of the DOE Act. Like Texaco, where TECA found that it did not have jurisdiction to determine an issue of FERC's statutory authority, Texaco, 616 F.2d at 1195-97, Atlantic Richfield did not involve issues that required interpretation of the DOE Act and application of the EPAA/ESA.
 
 
 45
 Even if the companies' construction of Atlantic Richfield was correct, their jurisdictional argument still would fall short. It would do so because this court is bound by TECA precedent. Texas American, 44 F.3d at 1561. To the extent, if any, that the D.C. Circuit's decision in Atlantic Richfield could be said to be inconsistent with Texaco, that decision would not control this case. Under Texaco and other TECA precedent, TECA's jurisdiction extended to cases that involved the interpretation of the DOE Act and the application of the EPAA/ESA. Id. at 1563; Texaco, 616 F.2d at 1196, 1197 n. 2.
 
 
 46
 The companies acknowledge that "[t]his consolidated appeal involves judicial review of 'Remedial Orders' issued as final agency action by [FERC] under the exclusive authority of § 503(c) of the [DOE Act]." Section 503 pertains exclusively to remedial orders addressing "[v]iolations of rules, regulations, or orders promulgated pursuant to [the EPAA]." As mentioned above, FERC found that Petrade violated the layering regulation and the permissible average markup regulation, Petrade, 62 FERC at 61,166-67, and that Phoenix violated the layering regulation, Phoenix, 65 FERC at 61,873, 61,878. These regulations were promulgated by DOE as a final rule in December of 1977 under the authority of the EPAA and the DOE Act. 42 Fed.Reg. 64,856, 64,864 (December 29, 1977); See MAPCO, 993 F.2d at 238; MAPCO, 783 F.Supp. at 641-42.
 
 
 47
 Phoenix and Petrade argue, nevertheless, that under Texaco, TECA would not have had jurisdiction in this case because this appeal concerns "Remedial Orders ... issued by FERC under the exclusive authority of DOE Act § 503(c)." (emphasis added). The companies' Texaco argument fails because this appeal does not "involve[ ] an interpretation of the DOE Act itself and not an application of any other law." Texaco, 616 F.2d at 1196. Instead, this appeal involves violations of two regulations issued under the EPAA, and the prosecution of those violations under DOE Act section 503. By its plain terms, section 503 involves "[v]iolations of rules, regulations or orders promulgated pursuant to Emergency Petroleum Allocation Act of 1973." 42 U.S.C. 7193(a). Thus, we are reviewing DOE agency action undertaken pursuant to DOE Act section 503 in order to enforce regulations issued under the EPAA/ESA. This appeal, therefore, meets TECA's two threshold jurisdictional requirements, as restated by this court in banc in Texas American: "(1) resolution of the litigation must have required application or interpretation of the EPAA/ESA or its regulations, and (2) the EPAA/ESA issue must have been adjudicated in the district court." 44 F.3d at 1563. In sum, the companies' argument that this court lacks jurisdiction over the appeal is without merit.
 
 
 48
 Alternatively, Phoenix and Petrade argue that if this court has jurisdiction over the appeal, the appeal nevertheless must be bifurcated and certain issues transferred back to the Fifth Circuit. Texas American recognized TECA's jurisdictional policy and practice of deciding only the EPAA/ESA issues in a case, and leaving to the regional circuit courts all other discrete issues arising in the same transaction or joined to the EPAA/ESA issues. 44 F.3d at 1563. As noted above, the companies contend that two issues raised in this appeal--whether FERC improperly shifted the burden of proof and whether FERC erred in failing to consider the companies' arguments that the regulations at issue are invalid--are issues which involve only interpretation of the DOE Act, and not application of the EPAA/ESA, and thus are not issues over which TECA would have had jurisdiction. Hence, we have no jurisdiction.
 
 
 49
 The companies' alternative jurisdictional argument also fails. In Pennzoil, TECA held that its jurisdiction extended to issues not arising under the EPAA when a meaningful ruling required consideration of the issues as a whole, the issues in the case were so commingled as to render separate treatment impractical, or the non-EPAA issues were subsidiary, preliminary, or threshold to an EPAA issue. 928 F.2d at 1141. We conclude that under Pennzoil we have jurisdiction over the two issues cited by Phoenix and Petrade and will not transfer them to the Fifth Circuit. At least in this case, these issues are so commingled with the ultimate question--whether the ROs must be set aside--that separate treatment would be impractical.[5]
 
 
 50
 For the foregoing reasons, we conclude that the Fifth Circuit's dismissal of this appeal in favor of this court was in accord with the precedent of TECA and this court. Thus, under Christianson, the Fifth Circuit's decision to dismiss was plausible. The companies' requests to transfer the appeal back to the Fifth Circuit, in whole or in part, are denied.
 
 II. The Standard of Review
 
 51
 The parties contest the standard of review. In MAPCO, TECA summarized its standard of review as follows:
 
 
 52
 An appellate court's examination of the summary judgment determination of the district court is a de novo review of the record and controlling law. However, judicial review of an agency action is statutorily limited by § 211(d)(1) of the [ESA]: The order may be set aside only if it is "in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence." The [TECA] recognizes the DOE's administrative expertise and accord[s] the agency's determination great deference. Therefore, this court must approve the DOE decision if there is a rational basis for it.
 
 
 53
 993 F.2d at 239 (citations omitted). The companies argue that Congress struck TECA's standard of review because, as noted above, FCAA section 102(a) amended ESA section 211 by striking subsections (b) through (h).
 
 
 54
 The government responds that ESA section 211(d) still provides the standard of review because there are two ESAs: the original ESA, and the ESA as incorporated into the EPAA. Thus, while the original ESA section 211(d) was struck by FCAA section 102(a), the EPAA's ESA section 211(d) "still exists."
 
 
 55
 The companies reply that the FCAA clearly amended the ESA as incorporated in the EPAA, because the ESA as a separate statute expired in 1974. Accordingly, the companies argue, the section 211(d) standard of review has been eliminated from the statutory scheme. The companies do not state what standard of review applies to EPAA/ESA actions, however, as they acknowledge that ESA section 207(a) exempts functions exercised by DOE under the EPAA/ESA from operation of the Administrative Procedure Act.[6]
 
 
 56
 We reject the government's argument that, in 1992, Congress amended the expired ESA rather than the EPAA's ESA provisions. We agree with the companies that the government's notion of dual ESAs is implausible. There cannot be one ESA unamended by the FCAA, and one as amended by the FCAA. If there are dual ESAs, one original and one incorporated in the ESAA, Congress amended both in FCAA § 102. When Congress struck subsection (d) of ESA section 211, it struck the statutory provision which specified TECA's, and thus this court's, standard of review over EPAA/ESA agency actions.
 
 
 57
 Thus, apparently due to an oversight, Congress left this court without a statutorily prescribed standard of review over EPAA/ESA agency actions. The FCAA, however, clearly directs that appeals of such actions shall be brought in this court. Thus, this court must necessarily apply a standard of review. We see no reason to deviate from the standard of review applied by TECA. As stated in MAPCO, this court will set aside an EPAA/ESA agency action only if it is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence. We recognize DOE's administrative expertise, accord the agency's determination great deference, and must approve the DOE decision if there is a rational basis for it. MAPCO, 993 F.2d at 239.
 
 III. The Appeal of the ROs
 
 58
 In MAPCO, TECA reviewed the circumstances under which DOE issued the layering and PAM regulations (collectively "the regulations"). The court recounted that in the 1970s there was a large increase in the number of crude oil resellers and a change from the traditional reselling activities of gathering, storing, and transporting crude oil to an almost instantaneous transfer of title from a seller to a buyer. Id. at 238. Transfers where a firm obtained title to crude oil to be delivered in the future and transferred that right to future delivery to another firm were called "in-line transfers." Id. at 238 n. 5. DOE issued the regulations in order to limit legitimate resellers (i.e. those gathering and moving crude oil) to a "permissible average markup" of their prices each month. No price markup was allowed for crude oil resales in which no legitimate reselling activity occurred. Id. at 238.
 
 
 59
 Under the layering regulation, "layering" is
 
 
 60
 the insertion of one or more "resellers" between the producer and refiner and the charging of one or more markups, where the "layering" firm performs no service or other function traditionally and historically associated with the resale of crude oil.
 
 
 61
 Phoenix, 65 FERC at 61,873 n. 2, citing Amendments to Mandatory Petroleum Price Regulations, 42 Fed.Reg. 41256, 41262 (August 15, 1977). The layering regulation provided in part:
 
 
 62
 The price for crude oil charged by a reseller which in a sale performs no service or other function traditionally and historically associated with the resale of crude oil shall not exceed the actual price paid by the reseller for the crude oil....
 
 
 63
 Phoenix, 65 FERC at 61,873 n. 2, citing 10 C.F.R. § 212.186 (1980). The PAM regulation provided in part:
 
 
 64
 A reseller may charge any price in a sale of crude oil, provided that the reseller's average markup for each month shall not exceed the reseller's permissible average markup, and provided that a reseller shall not unreasonably discriminate or grant unreasonable preferences in the pricing of crude oil among its purchasers. 42 Fed.Reg. 64856, 64865 (Dec. 29, 1977), reprinted at 10 C.F.R. § 212.183.
 
 
 65
 MAPCO, 993 F.2d at 245 n. 12. In addition, the PAM regulation contained a "safe harbor" provision, whereby a reseller that exceeded the PAM would nevertheless be deemed to be in compliance with the regulation if, in any month prior to the establishment of the PAM, its prices for each grade and tier of crude oil did not exceed the prices of its nearest comparable reseller, for the same grade and tier of oil in that month. 10 C.F.R. § 212.183(c) (1980); Petrade Int'l, Inc., 51 FERC (CCH) p 63,023, 65,107 (1990).
 
 
 66
 The Phoenix FERC RO found that Phoenix had violated the layering regulation by also reselling crude oil at prices in excess of acquisition costs without providing any traditional or historical reseller services or functions. Phoenix, 65 FERC at 61,873. The Petrade FERC RO found that Petrade had violated both the layering regulation and the permissible average markup regulation. Petrade, 62 FERC at 61,166-67. The companies challenge the FERC ROs on three grounds. First, they argue that the crude oil transactions at issue involved futures contracts not subject to the regulations. Second, they contend that DOE did not meet its burden of proof in proving the violations of the regulations. Third, the companies assert that the ROs must be remanded because FERC erred when it refused to consider their arguments that the regulations were invalid. We consider each of these contentions in turn.
 
 A.
 
 67
 Phoenix and Petrade argue that the regulations apply only to the sale of crude oil, i.e. the sale of a tangible good. The in-line transfers at issue, according to the companies, are not subject to the regulations as they do not involve the sale of crude oil, but the sale of intangible contract rights to future deliveries of crude oil. The companies base their argument on "the plain and ordinary meaning of 'sale of crude oil' in 10 C.F.R. § 212.181." The government responds that under the companies' interpretation of the regulation, all layered in-line transfers would be exempt from the regulations.
 
 
 68
 We find the companies' argument unpersuasive. As TECA noted in MAPCO, the proscribed layering transactions involved resellers who never had physical possession of crude oil, but obtained title to crude oil to be delivered in the future and then transferred that right to future delivery to other resellers. 993 F.2d at 238 n. 5. That is precisely what happened here, a fact which is not altered by recharacterizing the in-line transfers as futures contracts. The companies' argument that the regulations cover only some sort of tangible sale of crude oil--perhaps only transactions where a seller and buyer physically exchange cash or notes for oil--is without merit.
 
 B.
 
 69
 The companies also argue that FERC improperly shifted the burden of proof of violation of the layering regulation when it accepted DOE's showing that the transactions were in-line transfers. In Phoenix, the FERC ALJ found that DOE delineated a series of in-line transfers executed by Phoenix. Phoenix did not contest the characterization of these transactions as in-line transactions. Phoenix also admitted that it did not own or operate any crude oil pipelines or other crude oil transportation facilities. Phoenix, 55 FERC at 65,063-64. In Petrade, the FERC ALJ found that Petrade had acknowledged that all of the transactions at issue were in-line transfers and that Petrade did not gather, store, or transport crude oil. Petrade, 51 FERC at 65,107. According to the companies, it was improper for FERC to require them to adduce exculpatory evidence that would prove that the in-line transfers did not violate the layering regulation. In addition, the companies assert that they adduced evidence that their transactions each involved a "service or other function traditionally and historically associated with the resale of crude oil," which DOE failed to controvert.
 
 
 70
 TECA squarely rejected this burden of proof argument in MAPCO, where the company raised the same arguments that Phoenix and Petrade assert before us. TECA succinctly stated that "MAPCO has raised a red herring by claiming the burden of proof was wrongly shifted. There was no shifting; MAPCO simply failed to defend against the government's evidence of MAPCO's overcharge violations." MAPCO, 993 F.2d at 245. The same thing happened here; the companies failed to defend themselves against the government's evidence. As for the argument that the companies provided a "service or other function traditionally and historically associated with the resale of crude oil," we need only note that the service to which the companies refer essentially was obtaining title to crude oil from one reseller and selling it to another. We have already rejected this attempt to exalt form over substance.
 
 
 71
 Petrade raises a similar argument with respect to the PAM regulation and its safe harbor provision, § 212.183(c).[7] Petrade acknowledges that DOE produced evidence that Petrade's average markup exceeded the PAM, but argues that FERC erred in shifting the burden of proof by not requiring DOE to prove that Petrade's average markup exceeded the prices charged by its nearest comparable reseller. Petrade contends that FERC erred by treating the nearest comparable reseller provision of § 212.183(c) as an affirmative defense for Petrade to prove, rather than as part of DOE's prima facie case. According to Petrade, because it produced evidence showing compliance with the nearest comparable reseller provision of § 212.183, which DOE failed to rebut, DOE failed to prove its prima facie case.
 
 
 72
 Petrade's PAM regulation burden of proof argument fails for the same reasons the layering regulation burden of proof argument failed. There was no improper shifting of the burden of proof, and Petrade has simply failed to defend against DOE's evidence. Cf. MAPCO, 993 F.2d at 245. FERC did not err in holding that the nearest comparable reseller provision is an affirmative defense. We agree with FERC holdings to the effect that section 212.183(c) sets forth an affirmative defense to be proved by the party asserting it. Merit Petroleum, Inc., 43 FERC (CCH) p 63,021, 65,193 (1988); MAPCO Int'l, Inc., 36 FERC (CCH) p 63,037, 65,114 (1986).
 
 C.
 
 73
 The third issue raised by the companies also was decided by MAPCO. The companies assert that FERC erred because it failed to consider their arguments that the layering and PAM regulations were invalid. In Erickson Refining Corp., 41 FERC (CCH) p 61,286 (1987), FERC held that it lacked jurisdiction to decide challenges to the validity of DOE's crude oil regulations. See MAPCO, 783 F.Supp. at 641 n. 2, 643 n. 6. Because TECA held in MAPCO that the crude oil regulations at issue in this case are both substantively and procedurally valid, 993 F.2d at 239-44, we need not reach the issue of whether FERC erred in not considering the companies' challenge to the regulations.
 
 CONCLUSION
 
 74
 We hold that we have jurisdiction over the appeal and each of the issues presented. As far as the merits are concerned, we hold that there were rational bases for the final ROs issued by FERC, and that the ROs were not based upon findings not supported by substantial evidence. Therefore, the decision of the district court affirming the ROs is affirmed.
 
 COSTS
 
 75
 Each party shall bear its own costs.
 
 
 76
 AFFIRMED.
 
 
 
 [1]
 The enforcement proceeding against Petrade was instituted on December 1, 1983, when the Economic Regulatory Administration ("ERA") of DOE issued a Proposed Remedial Order ("PRO"). Petrade, 15 DOE at 86,044. The Office of Hearings and Appeals ("OHA") of DOE affirmed and modified the PRO, id. at 86,061, and thereby issued the DOE RO
 
 
 [2]
 The enforcement proceeding against Phoenix was instituted on September 12, 1985, when the ERA issued a PRO. Phoenix, 17 DOE at 86,177. The OHA affirmed and modified the PRO. Id. at 86,197
 
 
 [3]
 We review the statutory and administrative history for three reasons. First, this appeal presents issues of first impression for this court, because the Federal Circuit only recently assumed jurisdiction over appeals that previously would have been taken to TECA. Second, the companies challenge our jurisdiction, and we must adhere to the "overarching principle that requires us continually to inquire into our jurisdiction because as [a] court[ ] of limited jurisdiction we cannot act without assuring ourselves of the statutory predicate for such action." Smith v. Orr, 855 F.2d 1544, 1555 (Fed.Cir.1988) (Bissell, J., concurring) (quoting Chabal v. Reagan, 822 F.2d 349, 355 (3rd. Cir.1987)). Lastly, we were unable to locate, nor did the parties cite, TECA opinions detailing the broad history of the ESA and the EPAA and the agencies responsible for enforcing those statutes. Cf. United States v. Sutton, 795 F.2d 1040, 1051 (Temp.Emer.Ct.App.1986) ("The history and application of the [ESA] and the [EPAA] have been many times reviewed by the Court and that history will not be again reviewed in detail."), cert. denied, 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 828 (1987)
 
 
 [4]
 The President's authority under the EPAA originally was set to expire on February 28, 1975. Bonray, 472 F.Supp. at 901. After four extensions, id., it expired on September 30, 1981. Energy Policy and Conservation Act, Pub.L. No. 94-163, § 461, 89 Stat. 871, 955 (1975); Texas American, 44 F.3d at 1562. Pursuant to the EPAA, however, expiration of this regulatory authority did not "affect any action or pending proceedings ... not finally determined ... nor any administrative, civil, or criminal action or proceeding, whether or not pending, based upon any act committed or liability incurred prior to [the] expiration date." EPAA § 18, 89 Stat. at 955; Texas American, 44 F.3d at 1562. So, while the EPAA/ESA expired 15 years ago, and the ESA expired 22 years ago, they continue to govern this action (instituted by the DOE 13 years ago)
 
 
 [5]
 In any event, we have jurisdiction over the burden of proof issue as an EPAA/ESA issue which was adjudicated in the district court. The exclusive jurisdiction of TECA extended to "any issue requiring interpretation or application of the EPAA, ESA, or related regulations." Texas American, 44 F.3d at 1563, citing Mobil Oil Corp. v. Department of Energy, 728 F.2d 1477, 1497 (Temp.Emer.Ct.App.1983), cert. denied, 467 U.S. 1255, 104 S.Ct. 3545, 82 L.Ed.2d 849 (1984). In MAPCO, TECA rejected the argument that DOE had improperly shifted the burden of proof of proving a violation of the layering regulation. In so doing, the court interpreted the layering regulation, which is an EPAA/ESA related regulation. MAPCO, 993 F.2d at 244-45. Thus, the burden of proof issue is an EPAA/ESA issue, over which this court has exclusive jurisdiction
 Moreover, the question of whether certain EPAA/ESA regulations are invalid is one that was adjudicated in the district court and requires interpretation or application of the ESA/EPAA and related regulations. We therefore also have jurisdiction over this issue.
 
 
 [6]
 ESA section 207(a) provides: "The functions exercised under this title are excluded from the operation of subchapter II of chapter 5, and chapter 7 of title 5, United States Code, except as to the requirements of sections 552, 553, and 555(e) of title 5, United States Code." 85 Stat. at 747
 
 
 [7]
 As stated earlier, the PAM regulation contained a "safe harbor" provision, section 212.183(c), whereby a reseller that exceeded the permissible average markup would nevertheless be deemed to be in compliance with the regulation if, in any month prior to the establishment of the permissible average markup, its prices for each grade and tier of crude oil did not exceed the prices of its nearest comparable reseller, for the same grade and tier for oil in that month